MAURICE S. HYMAN, Respondent, *v.* BESSIE F. DWORSKY, as Sole Administratrix, etc., of ABRAM DWORSKY, Deceased, Appellant.

Third Department, November 14, 1933.

*Blodgett & Smith [Harold E. Blodgett of counsel], for the appellant.*

*Joseph Gans and Hiram S. Gans, for the respondent.*

HEFFERNAN, J. The two appeals before the court are contained in one record, were argued together and will be disposed of in that manner.

Appellant is the administratrix of the estate of Abram Dworsky, her deceased husband, whose death occurred on November 28, 1928.

The action was brought to recover the sum of $8,000, which appellant's intestate is alleged to have borrowed from respondent on September 19, 1927, and to have given as evidence of the loan his check for that amount payable to one Herman S. Mendelson, and indorsed by the latter to respondent's order.

The case was tried on the 28th and 29th days of September, 1932, more than five years after the alleged loan.

The circumstances surrounding the transaction in question are quite unusual. For many years Dworsky was successfully engaged in the furniture business in the city of Schenectady, N. Y. Mendelson, respondent's brother-in-law, was general manager of the enterprise. Deceased was highly regarded as a responsible business man. He had a good reputation, had ample credit at the bank where he transacted business and at his death he left a substantial estate.

Respondent's case rests principally on the testimony of his sister, Tinie Mendelson, wife of Herman S. Mendelson. The substance of her testimony is that respondent, her brother, a traveling salesman, residing in New York city, left his residence on September

19, 1927, and came to her home in Schenectady on the evening of the same day. There he met the witness, her husband and the deceased. Two boys, about seventeen years of age, one a son of the witness and the other a friend of the Mendelsons, were also present when deceased arrived. The witness, however, sent the boys into an adjoining room, because " there was something going on she did not want [them] to know about." The testimony of the witness as to what occurred is as follows: " Q. Did you see any money pass there? A. I did. Q. Just tell the judge and jury who passed the money and who received it? A. Mr. Hyman passed Mr. Dworsky $8,000. Mr. Dworsky deducted $480. He told him he would give him the interest; he told him he would give him the interest right then and there, $480. Q. Did they — A. For one year's interest he deducted and gave it back to my brother, then Mr. Dworsky spoke to him whether he would want a check or note. My brother says, he would prefer a check, so he took out a check he had and my husband filled it out and then after my brother gave him the money he signed the check and returned it to my brother. Q. The endorsement upon the back, your husband's name upon the back of that, did you see him sign? A. Yes, sir. Q. Was there any talk as to why the check was made that way with your husband's name? A. My brother was giving this loan to Mr. Dworsky as a favor. Q. Was that thing said? A. My brother was giving that loan to Mr. Dworsky as a favor to me; he said he would rather have it that way, everything is all right now, I am always away, I am upon the road, in case anything happens he would prefer a check for that reason, if anything goes wrong, Mr. Mendelson is the manager there, he would know if anything is wrong, he could put that check right through the bank. * * * Q. For how long was it spoken that the loan was to be? A. For one year at that time."

To some extent this testimony of this interested witness is corroborated by the two young men who were concealed elsewhere and who testified to admissions said to have been made by decedent to the effect that he requested the loan. They testified that they " wanted to listen " to what was going on. One said he saw respondent " hand Mr. Dworsky some money; " the other swore that respondent " handed over quite a bale of money " to Dworsky.

Briefly that is the evidence to sustain this judgment.

Death has sealed the lips of Dworsky and it is our duty to critically scrutinize the evidence offered to support a claim against his estate.

Public policy requires that claims against the estates of the dead should be established by very satisfactory evidence, and the

courts should see to it that such estates are fairly protected against unfounded and rapacaious raids. (*Matter of Van Slooten* v. *Wheeler* 140 N. Y. 624; *Rosseau* v. *Rouss*, 180 id. 116; *Matter of Sherman*, 227 id. 350.) As has been shown the evidence relied on to establish this claim rests upon the testimony of respondent's sister, his nephew and the nephew's friend. We have, therefore, to deal with probabilities. It is said that Dworsky received $8,000 in cash. What did he do with the money? He did not deposit it in any bank. He made no investments and liquidated no obligations that would account for this sum. He never discussed the loan with his wife. She never knew of the existence of the claim until its presentation on September 21, 1929. Singularly enough the record fails to show at whose request respondent came to Schenectady with $8,000 in cash, or who made the arrangements for the loan. There is no explanation of why the loan was a cash transaction. Quite significant also is the failure of respondent to explain where he obtained the money. If he withdrew it from a bank or obtained it elsewhere such proof could have been readily supplied. Mrs. Mendelson testified that her brother loaned Dworsky the money " as a favor to me." She did not disclose decedent's need of this " favor."

What we are asked to believe is that decedent and respondent met at the Mendelson home without any previous arrangement; the dead man was in dire need of $8,000 in cash and, *mirabile dictu*, respondent produced the desired sum from its place of concealment in his vest pocket and the transaction was thus consummated. It is important also to remember that the body of the check was written by Mendelson and to his own order. No reason is given why Dworsky did not write the check. This incident is highly significant in view of appellant's proof that it was her husband's custom when absent from business to leave checks signed in blank of which Mendelson had custody. The check ledger failed to list this particular check and the check book from which it was taken could not be located after Mendelson's discharge on July 6, 1929. When dismissed from service Mendelson said to appellant: " I am not through with you or with the Star Furniture; you will have a little sum to pay me." Later the claim in suit was presented. Another peculiar circumstance is that the loan was for one year. At maturity the check was not cashed and no demand was made for the payment of principal or interest. Undoubtedly this was due to the fact that Dworsky was still alive.

Surely this claim has not been established " by the clearest and most convincing evidence," which the courts exact in such

cases. The tale told by respondent's witnesses concerning the loan is highly improbable and not only strains credulity but suggests perjury.

Certain rulings of the trial judge are challenged. Mendelson testified in behalf of respondent. He denied that it was the custom of decedent to leave checks signed in blank. It became quite important, therefore, to impeach his credibility. Appellant's counsel endeavored to compel him to admit that he was the attorney whose conduct as such was being investigated, referred to in volume 150 of the Appellate Division Reports at page 445. On objection of respondent's counsel the witness was not required to answer. Appellant's counsel then asked the following: " Q. You were disbarred as an attorney and your name stricken from the roll of attorneys of the State of New York by the Appellate Division of the First Department of the State of New York upon May 17, 1912, were not you? Mr. Gans: That is objected to as wholly incompetent, immaterial and irrelevant. Objection sustained. Exception. Mr. Gans: I ask your Honor to instruct this jury that it was improper for counsel to ask the question and that they should pay no attention to any inference which it implies. The Court: That is so, this gentleman must respond in Court upon examination for any immoral or dishonorable acts of his lifetime when he takes the stand, he may be examined about them, but he is not required to answer questions in regard to the conclusions of others as to his integrity, honesty or morals, unless it appear before the court and jury that he has committed a crime. Mr. Blodgett: May I have an exception to your Honor's ruling? "

It will be seen that no inquiry was made as to the facts upon which his disbarment was founded; simply was he disbarred? The court's ruling constitutes reversible error. (*People* v. *Reavey,* 38 Hun, 418; affd., 104 N. Y. 683; *People* v. *Dorthy,* 156 id. 237; *Lansing* v. *Michigan Central R. R. Co.,* 143 Mich. 48.) The general rule is that when a person who has been disbarred or suspended from the practice of the law takes the stand as a witness proof of the disbarment or suspension is admitted to discredit his testimony. (28 R. C. L. 624.) Not only did the trial judge sustain the objection of respondent's counsel but he apparently acquiesced in the latter's criticism that appellant's counsel was asking improper questions.

A witness may be cross-examined concerning any immoral, vicious or criminal act of his life which may affect his character and show him to be unworthy of belief. (*People* v. *Webster,* 139 N. Y. 73; *Potter* v. *Browne,* 197 id. 288.)

The manifest purpose of appellant was to prove that the witness was a disbarred lawyer and that his word was, therefore, not entitled to the same weight as if his conduct had always been upright and blameless. One whose career indicates a lack of moral principles usually has little respect for the truth or the sanctity of an oath. If Mendelson had been guilty of an offense justifying disbarment, an offense implying turpitude and want of probity, there can be no doubt that this is a matter very properly to be taken into consideration in forming a due estimate of the value of his evidence.

While appellant's son was testifying, the trial judge in the presence of the jury made this unusual statement: " The Court: Gentlemen, I was thinking about this case last night and I am going to say to the jury and I say it to you now to give you an opportunity to call witnesses, if you desire to do it, that the jury may infer from the fact that Mrs. Dworsky is not called that her testimony would not be favorable to the defense and that the jury may infer from the fact that the plaintiff has not called the witness Mendelson who was present at the alleged transaction that his testimony would not be favorable to the plaintiff. Both of these witnesses are here in court and for some reason or other the parties did not see fit to call them. The jury will be permitted to take whatever inference they desire to draw on account of their failure to call these witnesses. Mr. Blodgett: May I have an exception to your Honor's statement with reference to the administratrix of this estate on the ground that she is prevented by statute from testifying and that there is no evidence here that anything . that she could say in this case would shed any light upon it at all because she was not present at the time of this alleged transaction. The Court: You always have the right to take an exception. What I have in mind, Mr. Blodgett, she was the administratrix, she had charge of the papers of this estate. Without testifying to a personal transaction, she could state whether or not there came into her possession as administratrix any papers or any records or any memorandum or any information bearing upon this transaction."

So far as appellant was concerned her only witness to this transaction was dead. There was no suggestion from any of the parties that appellant had any personal knowledge of the matter. She was not present at and did not participate in the conference which resulted in the loan. There was nothing she could explain and hence her failure to testify could not give rise to the presumption that it would have been unfavorable. What the court meant by the statement that she could testify as to whether or not she found " any papers or any records or any memorandum or any informa-

tion bearing upon this transaction " is not very clear. According to all the evidence in the case the only written record was the check itself. The bookkeeper's testimony showed that no record of that instrument was made in the ledger. The check book itself disappeared at the time of Mendelson's discharge. As a result of this colloquy appellant had to take the witness stand or else let the jury draw an unfavorable inference from her failure to do so. She was subjected to a prolonged cross-examination regarding the transfer tax schedules filed by her lawyer. The court's ruling simply led to confusion and to the introduction of a multiplicity of collateral issues. We think the trial judge erred in making the statement which he did and that appellant was prejudiced thereby. (*Mowbray* v. *Gould*, 63 App. Div. 158; *MacReynolds* v. *Coney Island & Brooklyn R. R. Co.*, 170 id. 314.) The judgment and order denying the motion for a new trial should be reversed.

There remains for consideration the motion for a new trial on the ground of newly-discovered evidence. In view of our conclusion that there should be another trial, we shall discuss that application very briefly. Appellant made proof to the effect that she, decedent and a man named Dubbs and his wife left Schenectady in Dubbs' automobile on September 18, 1927, and were touring in the northern part of this State and in Canada until September twenty-second when they returned home. If that is the truth, Dworsky could not have been at the Mendelson home on the night of September nineteenth, when, it is claimed, he borrowed the money. The trial judge denied this motion, as appears from his opinion, for want of diligence, failure to claim surprise and a request for the withdrawal of a juror, that the new evidence is cumulative, vague and inconclusive and that in all probability it would not change the result. We do not agree with these conclusions. Appellant should not be penalized because in her preparation for trial she failed to remember that five years before she, her husband and the Dubbs were on a pleasure trip of several days' duration. The new evidence has probative force. It shows that Dworsky was not in Schenectady at the time claimed by respondent. The credibility of the new witnesses should not be determined on a motion but left to a jury on a new trial. Newly-discovered evidence contradicting the evidence of a witness upon a material issue is in general sufficient ground for applications of this sort. Ordinary diligence with respect to discovery of evidence before trial is all that is required. Moreover, the court possesses inherent power to grant such a motion where the ends of justice require it, even though a technical compliance with these requirements be not shown. (*Blood* v. *Colby*, 236 App. Div. 537.) This court is satisfied

that the ends of justice will be promoted by giving appellant the opportunity to present the newly-discovered evidence.

The judgment and order appealed from and also the order denying the motion for a new trial should be reversed and a new trial granted, with costs to appellant to abide the event.

HILL, P. J., RHODES, McNAMEE and BLISS, JJ., concur.

Judgment and orders reversed on the law and facts and new trial granted, with costs to the appellant to abide the event.