SUSAN SEYMOUR *et al.*, Plaintiffs-Appellees and Cross-Appellees, v. SID-NEY WILLIAMS, Defendant-Appellant and Cross-Appellee (Susan Seymour, Cross-Appellant; Ruth Williams, Intervenor-Appellee and Cross-Appellant).

First District (4th Division)   No. 1—91—0267

Opinion filed June 30, 1993.

Scott A. Brainerd and Michael Closen, both of Chicago, for Sidney Williams and Ruth Williams.

Daniel S. Hefter and Darcy L. Dulbis, both of Hefter & Radke, of Chicago, for Susan Seymour.

PRESIDING JUSTICE JIGANTI delivered the opinion of the court:

This appeal arises from the dissolution of a partnership, the Victorian Chicago Arts & Crafts Antique Gallery, which was operated by the plaintiff, Susan Seymour, and the defendant, Sidney Williams. Susan filed a claim against Sidney alleging breach of fiduciary duty and conversion. Following a bench trial, the court ordered the partnership liquidated and determined Susan's and Sidney's interests in the partnership assets, as well as the partnership debt to Ruth Williams, Sidney's mother.

Sidney appeals the trial court's distribution of assets and the court's decision to allow Susan to purchase certain items of partnership inventory at cost. Susan has cross-appealed contending that the court erred by distributing the profits on a 50-50 basis. She further argues that the court should not have dismissed her claim against Sidney for conversion. Susan also has appealed the court's finding that Ruth had title to a Frank Lloyd Wright chair and the court's order to repay Ruth a sum of money which she loaned to the partnership. Ruth has appealed the amount of the court's award to her and claims that she loaned the partnership more money than she was repaid.

Susan and Sidney entered into an oral agreement in 1981 to start an antique business in which they would purchase, restore, and resell antique furniture. They agreed to both contribute capital and to both work in the business in addition to keeping their other jobs. Susan testified that although their goal was to have a 50-50 partnership, at the time of the inception of the business, Sidney did not have much money and Susan was to be the principal investor. She further testified that the ownership of the business and the distribution of profits would be determined yearly by how much they had each invested in the business less whatever monies they took out of the business. According to Susan, they also agreed that since they were both collectors of antiques, either one of them could purchase any of the partnership antiques at the partnership purchase price, as long as the other partner agreed. They operated the business out of Susan's home, where the inventory was stored until 1987 when they began to store and sell furniture at a warehouse.

Susan and Sidney operated the business very informally, including the operation of their business finances. Susan was in charge of keeping the records for the business and testified that she kept meticulous records that were contemporaneous with all of her transactions as well as Sidney's transactions of which she was aware. A business bank account was not set up until 1984. Prior to this time, the proceeds from the sale of merchandise either went into Sidney's personal account or Susan's personal account depending on which one of them needed money at the time. They both continued to contribute capital as needed. Once the business account was set up, a certain amount of money went into the business account, some went into their personal accounts, and both the business account and their personal accounts were used to cover business expenses.

Susan testified that she kept a ledger from 1981 until 1984 of all business expenditures. She stopped maintaining the ledger in 1984 because Sidney was not giving her receipts of his expenditures. To her

knowledge, Susan never obtained all of Sidney's records. Susan kept all of her own cancelled checks and receipts.

In 1988, Susan and Sidney ceased to operate the business together and Sidney locked the warehouse, preventing Susan from having access to partnership inventory. A temporary restraining order was issued against Sidney prohibiting him from denying Susan access to partnership inventory.

At the onset of litigation, Susan subpoenaed all of Sidney's bank accounts in order to determine his deposits and his income from the proceeds of sales of partnership merchandise. Susan discovered that about $15,000 in deposits had been made into Sidney's account that she had not known about from the sale of items that he had not disclosed to her.

Susan compiled all of the records of her own transactions and the ones that she knew about from Sidney and made summaries of expenditures, business expenses, and income. She subsequently gave them to an accountant, Barry Klayman. Klayman gave Susan a report with regard to those records. Susan stated that until that time, she did not know what the capital accounts of the respective partners were.

Klayman testified at trial that he is a certified public accountant and at least 40% of his business dealt with accounting for partnerships. Klayman was provided with cancelled checks, receipts, Visa statements, check stubs, and contemporaneous books for the partnership. He stated that he had sufficient information from those materials to put together a compilation of the capital accounts of the partnership of Victorian Chicago. Klayman made a summary of the capital account balance of the partnership from its inception through August 15, 1990. The summary illustrated the contributions, profits, profits allocated on the capital ratio, and distributions. Klayman testified that Susan contributed $189,847 to Victorian Chicago. Sidney contributed $120,043. Susan took out $109,879 and Sidney took out $154,632. There had been a total profit of $830,218. Based upon the assumption that the partnership agreement was that profits and losses would be split proportional to capital accounts, Susan would receive all of the profits and losses because Williams always had a negative capital account. Susan would then have an ending balance of $163,186 and Sidney's ending balance was a negative balance of $34,589. Thus, if their agreement was to split the profits according to their capital contributions, Susan would receive 100% of the remaining assets of the partnership and would be entitled to an additional $34,589 from Sidney. Klayman also calculated the partnership shares pursuant to the Uni-

form Partnership Act provision that all of the profits and losses are split equally. (Ill. Rev. Stat. 1989, ch. 106½, par. 18(a).) Applying the Uniform Partnership Act, Susan had an ending balance of $120,077 and Sidney, $5,520. Thus, after the creditors were paid, the remaining partnership assets would be divided 95% to Susan and 4% to Sidney.

Sidney testified that when the partnership began in 1981, he personally owned antiques which were sold for approximately $20,000 which was put into the business. Sidney stated that he and Susan had agreed that the partnership would pay him $500 a month for space that was used to store inventory. He stated that he did not supply Susan with records of all of the transactions that he engaged in for the partnership. Sidney stated that often Susan would refuse his offers to provide her with records. Sidney also had a fire in his residence at one time which destroyed records. Susan refused to do inventories. Sidney stated that he did not take $135,000 out of the partnership over time for his own personal use, but, rather, used it for partnership purposes. However, he did not keep any records of how much money he took out of the business from 1981 to the present. Sidney could also not produce any documentation for the $20,000 in inventory which he allegedly contributed to the partnership at its inception.

The court ordered the partnership dissolved and found that the total capital of the partnership was $125,597. Susan's capital share was $120,077 and Sidney's, $5,520. The partners were to sell all partnership property and the partnership funds were to be distributed as follows: the first $23,000 was to be paid to Ruth Williams in payment of the partnership obligation to her, the next $125,597 was to be paid 95.6% to Susan and 4.4% to Sidney, and any remaining funds were to be divided equally between Susan and Sidney.

Sidney now contends that the court erred in awarding Susan 95% of the capital and should have divided the assets equally between them. Sidney argues that Susan's records were incomplete and, in many cases, inaccurate. Sidney complains that he was not credited properly for his own contributions, received no rent for the building which he purchased, and was not reimbursed properly for his own business expenditures. Sidney claims that the court abused its discretion in adopting Susan's accounting as the basis for its distribution of partnership assets. Sidney insists that the court should not have accepted Klayman's figures as the basis for its determination of capital and profits because Klayman's testimony relied on Susan's incomplete or selectively retained information which was never made available to Sidney.

■ We believe there was sufficient evidence from which the trial court could divide the partnership assets according to the Uniform Partnership Act (Ill. Rev. Stat. 1989, ch. 106½, par. 18(a)), which provides:

> "Each partner shall be repaid his contribution, whether by way of capital or advances to the partnership property and share equally in the profits and surplus remaining after all liabilities, including those to partners, are satisfied ***."

Despite the imprecise nature of the parties' business practices, Susan provided records to substantiate each partner's contributions to the partnership, their distributions, and the partnership profits. We agree with Sidney's position that a fiduciary relationship exists between partners and each is bound to exercise the utmost good faith in all dealings and transactions related to the partnership. (*Rizzo v. Rizzo* (1954), 3 Ill. 2d 291, 120 N.E.2d 546.) Further, the managing partner who is responsible for all of the financial aspects of the partnership has a duty, as trustee, to maintain regular and accurate records and to account for partnership transactions. (*Couri v. Couri* (1983), 95 Ill. 2d 91, 447 N.E.2d 334.) However, Susan testified that she kept contemporaneous records of all of her transactions as well as those which Sidney reported to her. Susan conveyed those records and the records which she subpoenaed from Sidney's bank to Klayman, a certified public accountant, whose testimony was used to determine the division of profits.

Sidney, on the other hand, provided the court with no records or evidence to contradict or augment any of the only concrete evidence in the record. Thus, there was ample evidence to substantiate the trial court's apportionment of partnership assets.

Susan has also argued in her cross-appeal against Sidney that the trial court erred in applying the Uniform Partnership Act in its division of assets. Susan argues that the evidence in the record supports the fact that she and Sidney agreed that the partnership interests would be determined by the amount of capital that each partner had invested in the partnership at any given time. According to Klayman's testimony at trial, if the calculations were done by this method, Susan would receive 100% of the partnership profits and Sidney would owe her an additional $34,589.

Partnership agreements as to the division of profits may be express or implied from acts, transactions, and the previous conduct of the partners. (*Flannery v. Flannery* (1943), 320 Ill. App. 421, 51 N.E.2d 349.) Susan supports her argument of her agreement with

Sidney by pointing to her testimony at trial where she stated that the partners had an express agreement. Susan testified:

> "Though our goal was to have a 50/50 partnership, at that time Mr. Williams did not have much money so that I was going to be the principal investor into the business and he would continue to work. ***
>
> In the meantime we agreed that the ownership of the business ***, minus, of course, *** whatever money we took out of the business from sales and that profit would be distributed *** in the same manner."

Sidney, on the other hand, denied at trial that he and Susan were working towards a 50-50 partnership and was impeached with his deposition testimony in which he agreed that he talked to Susan about trying to reach a 50-50 level of partnership ownership.

■ At best, it was difficult to determine from the parties' testimony what they expressly agreed to. The Uniform Partnership Act provides that the rights of partners in relationship to the partnership are determined by the provisions in the Act "subject to any agreement between them." (Ill. Rev. Stat. 1989, ch. 106½, par. 18.) We believe that in the absence of conclusive evidence of an agreement, the trial court appropriately applied the provision of the Act for an equal distribution of profits.

Sidney further appeals from the court's order giving Susan the right to purchase, at cost, from the partnership any or all of 191 antiques. The purchase of the items would be satisfied out of Susan's portion of the partnership proceeds. Sidney argues that the items have greatly appreciated over time and the court should have ordered Susan to pay the fair market value. In his reply brief, Sidney argues that the items should be sold and the profits should be divided equally. Sidney contends that Susan is not entitled to the accumulated appreciation of the 191 partnership assets. Further, there is not enough evidence in the record to establish that Sidney agreed on 191 separate occasions to allow Susan to purchase at cost the 191 items of partnership property.

The question of whether the parties intended to enter into a contract is an issue to be decided by the trier of fact. (*Northern Illinois Construction Co. v. Zale* (1985), 136 Ill. App. 3d 822, 483 N.E.2d 1013.) The determination in that regard will not be reversed unless it is contrary to the manifest weight of the evidence. *Howard A. Koop & Associates v. K P K Corp.* (1983), 119 Ill. App. 3d 391, 457 N.E.2d 66.

Susan testified that she and Sidney agreed that either one of them could purchase any of the partnership antiques at partnership price, as long as they both agreed. She stated that Sidney had agreed that she could purchase at cost each of the items on a prepared list which was admitted into evidence. Sidney at one point testified that there was no such agreement. He also testified that there was such an agreement but that it was limited to two pieces of furniture. He was impeached with his deposition testimony in which he admitted that such an agreement had been made with respect to a "host of things." Four other witnesses testified that on various occasions they knew about different pieces of furniture that either Susan or Sidney wanted to keep for herself or himself. Additionally, another list of items of furniture was admitted into evidence which the court ordered that Sidney could purchase at partnership cost.

■ We believe that the evidence supports the court's finding that the parties agreed that either one of them could purchase items of antiques at partnership cost as long as the other party agreed. The only evidence which Sidney has presented to the contrary was his own conflicting testimony. Further, because of the general nature of their agreement, it was not necessary that Susan prove that they agreed 191 times on 191 occasions to each item on the list.

Susan has further alleged in her cross-appeal that the court erred by not holding Sidney liable for conversion. In Susan's original complaint, she alleged that Sidney had converted partnership property when he changed the locks at the warehouse where partnership inventory was stored, precluding Susan from selling the inventory. Further, Susan alleged that Sidney had removed numerous pieces of partnership furniture to locations other than the warehouse and had held them there for nonpartnership purposes.

After hearing all of the testimony at trial, the judge issued a final order in which the count for conversion was "dismissed." The order further stated that Sidney was to return to the partnership warehouse the items of partnership inventory which were listed by Susan as the items which he had taken. Susan now complains that the judge should not have dismissed her claim for conversion as she asserted sufficient facts to support her claim.

We first note that the dismissal in the final order was, in fact, a judgment for Sidney. There were no motions or pleadings seeking to dismiss the conversion count as a matter of law. The order was entered after the trial court heard all of the evidence. Therefore, the order was mischaracterized as a dismissal and was, in fact, a finding that Susan had not proved conversion of the partnership assets by a

preponderance of the evidence. Thus, we must determine whether judgment for Sidney on the conversion count was against the manifest weight of the evidence.

A party claiming conversion must establish by a preponderance of the evidence the following elements: (1) an unauthorized and wrongful assumption of control, dominion, or ownership by a person over the personalty of another; (2) his right in the property; (3) his right to immediate possession of the property, absolute and unconditional; and (4) a demand for possession thereof. *Farns Associates, Inc. v. Sternback* (1979), 77 Ill. App. 3d 249, 395 N.E.2d 1103.

Here, we find that there was no unauthorized assumption of control. As Dean Prosser has described the degree of control required to constitute a conversion, it is "confined to those major interferences with the chattel, or with the plaintiff's rights in it, which are so serious, and so important, as to justify the forced judicial sale to the defendant." W. Prosser, Torts §15, at 80-81 (4th ed. 1971).

Susan's testimony illustrated that between June of 1988 and the date of trial, there were numerous occasions when Sidney changed the locks to the warehouse and she would not have access to its inventory. On one occasion, Sidney wrote her a letter explaining that his ultimate goal was to repay his mother the money that she had loaned the business and to raise the money he needed for the last of his operations. He explained that until these obligations were met, he would hold all of the present inventory in the warehouse and then they would decide how to divide the business and its contents. Susan wrote him a letter back and Sidney let her into the warehouse.

Susan also testified that she did not have a key to the warehouse on any regular basis until after June of 1988. She only had access through Sidney. In August of 1988, Susan told Sidney that she wanted to dissolve the business partnership and Sidney again changed the locks. At that point, Susan obtained a temporary restraining order to be allowed into the warehouse. Sidney changed the locks again in August of 1989 and explained to Susan that it was for security reasons. Various permutations of this scenario were repeated up until trial.

■ It appears from the evidence that the changing of locks and the moving of inventory from one location to another was analogous to the informal manner in which the parties conducted their partnership affairs generally. While it is certainly not the ideal way to run a business, we do not believe that, under the circumstances, Susan has proved that Sidney intended to exercise the kind of control over the partnership inventory that is required to constitute a conversion. As a

part of the dissolution of the partnership, the court has ordered Sidney to return all of the items of partnership inventory that Susan has listed as being in Sidney's possession. We do not believe that the court's finding for Sidney on Susan's claim of conversion was against the manifest weight of the evidence.

We are next called upon to review the court's decisions with regard to Ruth Williams, Sidney's mother. Ruth loaned money to the partnership on many occasions to purchase inventory. Included in the inventory which was purchased with Ruth's loans was a Frank Lloyd Wright chair.

In its final order, the court determined that the first $23,000 of partnership funds would be paid to Ruth in repayment of the partnership obligation to her. The court further awarded Ruth ownership of the Frank Lloyd Wright chair.

A separate appeal was filed on behalf of Victorian Chicago claiming that the correct amount owed to Ruth by the partnership is $11,469, rather than $23,000. Ruth has filed her own appeal which asserts that she should have been awarded $67,810, rather than $23,000. Victorian Chicago has also appealed from the court's award of the Frank Lloyd Wright chair to Ruth.

All of the parties agree that the partnership owes Ruth money for loans which she made over time to the partnership. The issue is how much money. At trial Ruth produced large numbers of cancelled checks, totalling $67,810, which had been deposited by Sidney into various bank accounts which included his personal account and a corporate account in the name of Victorian Chicago Hyde Park, Inc.

Ruth did not keep records of the money she lent the partnership. Of the $67,810 of cancelled checks which Ruth introduced, only $19,052 of them were payable to "Victorian Chicago." The remaining checks were payable to "Sidney Williams."

Susan acknowledged in her deposition that Ruth had loaned approximately $30,000 to the business which included the $7,000 that Ruth loaned the partnership for the purchase of the Frank Lloyd Wright chair. Susan testified at trial that since her deposition, she reviewed the financial records and discovered that of all the checks which were written by Ruth and payable to "Victorian Chicago," only $5,200 was used for partnership purposes. Further, Susan discovered that Ruth had been repaid over $2,000.

Susan contends on appeal that the trial court should have relied upon Susan's trial testimony and not her deposition testimony to determine the amount which the partnership owes Ruth. Ruth argues that the partnership should incur responsibility for Susan's failure to

record Ruth's loans. Thus, the partnership should be held liable for the full amount of the checks which were written by Ruth.

■ The trial judge is in the best position to resolve conflicts in testimony and to determine the credibility of witnesses. (*Flynn v. Cohn* (1992), 154 Ill. 2d 160, 607 N.E.2d 1236.) As was true throughout this case, the judge heard confusing and conflicting testimony with regard to the arrangements and financial dealings of this partnership. Based on our review of the record, we believe the court's determination of the partnership debt to Ruth was not against the manifest weight of the evidence.

Finally, Victorian Chicago contends that Ruth was not entitled to ownership of the Frank Lloyd Wright chair. We agree.

The record reveals that Ruth loaned the partnership $7,000 for the purchase of a Frank Lloyd Wright chair and several other small pieces of inventory. Susan testified that at the time of the loan, she and Sidney agreed that they would borrow money from Ruth to purchase the chair and in exchange for the loan, they agreed to repay Ruth her loan plus one-half of the profits from the sale of the chair. The remaining half of the profits from the sale would be split equally between her and Sidney.

In his deposition, Sidney stated:

> "The arrangement was that my mother would get her money back, and 50 percent of what the profit was. Susan Seymour would get a quarter. I would get a quarter."

There is also ample evidence in the record that the chair was treated as partnership property once it was purchased. Susan did restoration work on the chair and it was stored and displayed for sale with the rest of the partnership inventory. At one point, Sidney removed the chair from the warehouse where it was stored and placed it in Ruth's residence. However, Sidney listed the chair and other items which were stored at Ruth's home as "partnership inventory."

Ruth argues that whatever arrangements Susan and Sidney made for the chair are not relevant. The only relevant agreement was the one Ruth made with the partnership which was that she would at least "double her money" by investing in the chair. Thus, Ruth concludes, she was making an investment and not a loan to the partnership and since the chair was not sold, she is entitled to it.

We believe there is ample evidence that Ruth loaned money to the partnership for the purchase of the chair. The trial court treated the $7,000 which Ruth gave the partnership as a loan and subtracted this amount from $30,000 in determining what the partnership was required to repay her upon dissolution. There is also ample evidence

that the chair was partnership property. Under normal circumstances, this partnership asset would be divided equally between the partners. However, the evidence supports the fact that an agreement was made between the partners to pay Ruth 50% of the profits from the sale of the chair. As we have already discussed in this opinion, the Uniform Partnership Act honors such agreements and allows the partners to agree to deviate from the prescribed method of the division of profits.

■ Thus, we find that the court's decision to award Ruth the Frank Lloyd Wright chair was against the manifest weight of the evidence. The Frank Lloyd Wright chair is partnership property and should be sold according to the provision in the final judgment order which addresses the sale of all partnership property. As per their agreement, after Ruth is repaid her loan for the chair, the profits should be divided 50% to Ruth, 25% to Sidney, and 25% to Susan.

Accordingly, the judgment of the circuit court is affirmed in part and reversed in part.

Affirmed in part; reversed in part.

CAHILL and HOFFMAN, JJ., concur.