PODOLSKY AND ASSOCIATES L.P., as Successor and Assignee of Podolsky and Associates, Ltd., Plaintiff-Appellant, v. FRANCIS M. DISCIPIO *et al.*, Defendants-Appellees.

First District (3rd Division)    No. 1—97—3339

Opinion filed June 30, 1998.

Wildman, Harrold, Allen & Dixon, of Chicago (Thomas I. Matyas and Douglas W. Hyman, of counsel), for appellant.

Bond, Mork & Dickson, P.C., of Wheaton (Mary E. Dickson and Patrick K. Bond, of counsel), for appellees.

JUSTICE GORDON delivered the opinion of the court:

Plaintiff Podolsky and Associates L.P. (Podolsky) appeals a judgment entered at the close of evidence in a bench trial in the circuit court of Cook County that it was not entitled to a commission for a sale of real estate. It argues the court should have entered judgment in its favor on its breach of contract action or, in the alternative, that it is entitled to a retrial because the court erred in excluding certain evidence. For the reasons stated below, we affirm.

## FACTS

In November 1990, Podolsky entered into two agreements (collec-

tively, the listing agreements) to act as exclusive agent with authority to sell two separate but contiguous parcels of land (collectively, the property). Whether Podolsky was entitled to a commission under the listing agreements was the subject of its suit in circuit court. One agreement covered a parcel of property owned by Francis and Mary Discipio, and the other covered a parcel owned by Francis and Anthony Discipio, as well as other persons who settled with Podolsky prior to trial. (The defendants will thus be collectively referred to as the Discipios.) Other than the descriptions of the parcels and the names of the sellers, the agreements were identical.

The Discipios demanded $5 per square foot for the property and required that the sale be made for "cash at closing," but otherwise did not limit Podolsky's authority to sell the property on their behalf. No reference to any other prerequisites to a sale appear on the face of the listing agreements. They provided that Podolsky would be entitled to a commission

"payable in full at the closing of the sale:
(a) for your [Podolsky's] services in procuring a purchaser, on the above terms or such other terms as the undersigned shall accept, or (b) if the property is sold by you, by the undersigned, or by or through any other person, during the period hereof, or (c) if the property is sold within six (6) months after the terminating date hereof to a purchaser, on behalf thereof [*sic*], to whom it was submitted by you or your representatives, provided such party is identified on a list submitted to the undersigned within thirty (30) days after the expiration of this agreement."

The agreements also provided that the Discipios would "cooperate with you [Podolsky] in any way possible in bringing about a sale of said property and to refer to you all inquiries of brokers or others interested in said property, and that all negotiations or dealings shall be with and through you as agent."

The listing agreements were of 12 months duration, but provided that they could "be continued thereafter for additional specified periods by mutual agreement of the parties hereto as may be set forth in writing and signed by same." In October 1991 and November 1992 they were extended by letter agreements through November 1992 and November 1993, respectively. They were not extended past November 1993, and in November 1993, within 30 days after the final term expired, Podolsky submitted a list of purchasers to whom it had shown the property in accordance with subsection (c), quoted above. One of the entities listed was Town & Country Homes (Town & Country). The Discipios sold the property to Town & Country more than six months after November 1993, when the listing agreements finally expired.

Before trial, the court granted the Discipios' motion *in limine* to exclude any reference to the fact that Francis Discipio had been suspended from the practice of law for two years. The court granted the motion on the basis that the Illinois Supreme Court "had to make a finding that he no longer was under the burden of whatever happened before" since Francis had been readmitted to the practice of law. Francis testified at trial that in May 1993 Town & Country had sent him a written contract offering to purchase the entire property at the price of $5 per square foot. Francis testified that he did not remember whether the contract was already signed by a Town & Country representative when he received it. Before receiving the contract Francis had received a telephone call from Peter Brennan, general counsel for Town & Country, in which Brennan told him that Town & Country had an interest in the property. Francis testified that he told Brennan that there was "an exclusive" on the property and referred him to Podolsky. He did not negotiate with Town & Country prior to receiving the offer.

In June 1993, several months prior to the expiration of the final extension of the listing agreements, there was a meeting between the Discipios and Milton Podolsky, Randy Podolsky and John Musgjerd, all of whom were representatives of Podolsky. It was at this meeting that Podolsky first learned of the existence of Town & Country as a potential purchaser, when Francis showed the Town & Country offer to the Podolsky representatives. Francis stated that Randy attempted to photocopy the offer, but he did not allow him to do so "because I [(Francis)] wanted him to negotiate directly with Town & Country." He allowed Randy to write down notes regarding the offer, but never gave a copy of it to Podolsky. He testified that he destroyed the offer at some point after the meeting, without keeping a copy, because the offer was "not acceptable." He testified that the contract through which the Discipios later (after the expiration of the listing agreement) sold the property to Town & Country differed from the 1993 offer in that the final contract recited a minimum square footage and also provided for the disposition of crops being grown on the land.

Peter Brennan, general counsel to Town & Country, testified that it was his understanding that Francis represented all of the defendants until November 1994, at which time Brennan was notified that certain of the defendants were being represented by another attorney. He believed that he called Francis in June 1992 and told him that Town & Country was interested in purchasing the property. He did not remember Francis telling him at that or any time that the property was under an exclusive listing agreement with Podolsky. Brennan testified that he did not remember any negotiations regarding the

purchase once Town & Country offered $5 per square foot. He testified that he never discussed issues of square footage with any of the Discipios, and Francis never complained about how any of the contracts were worded with respect to what was included in the square footage subject to the contract. He also did not recall any negotiation regarding crops. Although Brennan did not specifically recall whether there had been any negotiation with Francis after Brennan sent him the contracts in June 1993, he stated that if there had been any, "it would have been minimal." Brennan stated that it was his practice to send out Town & Country's contracts with the "seller's [sic]" signature already thereon, although sometimes he would not, if the contract had not yet been negotiated. He did not have any drafts or copies of the offer he had sent in June 1993. Brennan did not remember ever speaking with anyone from Podolsky regarding the property. Brennan stated that Town & Country at all times had the capacity to close on the contracts sent to the Discipios in 1993 or 1994.

Brennan and Francis both testified that in 1989, before entering the listing agreement with Podolsky, the Discipios had negotiated with Town & Country for the sale of this same property. Those negotiations had gone so far as to produce a written contract signed by both parties, but the sale had fallen through before closing for reasons irrelevant to this case.

Milton and Randy Podolsky testified to a different version of what transpired at the June 1993 meeting. They both stated that the Town & Country offer was signed, and when Francis showed it to them he stated that he had the property "sold" for $5 per square foot, but he intended to wait until the term of the listing agreement had expired to "finish the deal" so that he would not have to pay them a commission, because they had not done any work. He did not ask Podolsky to do anything in the future and said nothing about minimum square footage or crops. Francis became angry when Randy attempted to photocopy the contract, and when Randy returned it to him he and his brother immediately left the office.

Milton and Randy testified that although after the June meeting they knew that Brennan was the attorney for Town & Country, they never called him because they believed it would have been unethical to have done so after Francis told them that there was a deal. They testified that no Podolsky representative ever spoke with Brennan. Milton stated that Podolsky continued to work on selling the land after the June meeting, although he thought that there would have been no point to bringing in another buyer.

Francis was recalled as a witness and testified that he did not say he was going to hold the contract and wait until the exclusive agree-

ment expired. Rather, he testified that he said that the property would be taken off the market if it was not sold during the term of the listing agreement. He testified that it was taken off of the market when the agreement expired, and he and his brother attempted to buy the smaller parcel from the other family members during late 1993 and early 1994. These negotiations broke down, and in May 1994 he received a letter from Brennan inquiring about when Town & Country could expect to receive the signed agreements. Francis testified that in subsequent conversations with Brennan he told Brennan there were parts of the 1993 offer that were not acceptable (no square footage and no provisions for crops or personalty), but if those terms were corrected, the Discipios would be willing to sell "after the farm season" in 1994. Brennan sent him a contract in June 1994, which the Discipios signed in December 1994.

The trial court found the Discipios were not liable for the commission. The court found that it had not been proven that Francis said that he would "wait until the termination of the agreement in order to proceed with Town & Country to—to, in effect, beat the Podolskys out of their commission." The court rejected Podolsky's position that it could not contact Town & Country because it was afraid of a lawsuit and stated that, although Podolsky would have received its commission if there had been a deal within the term of the contract, "it turned out that the deal didn't go through within six months after the contract. And as a result, there's no way under the contract itself that I can find that they're entitled to collect this commission." The court found that it did not have to resolve any issue involving square footage or crops because of the length of time between the actual sale and June 1993, when Podolsky was made aware of the offer from Town & Country.

## ANALYSIS

### I. PODOLSKY IS NOT ENTITLED TO A COMMISSION

Podolsky first contends that it was entitled to its 5% commission because a ready, willing, and able buyer made an offer during the term of the agency agreements which filled all of the requirements stated therein. We disagree.

As previously noted, the listing agreements provided for three ways in which Podolsky could become entitled to a commission:

"(a) for your [Podolsky's] services in procuring a purchaser, on the above terms or such other terms as the undersigned shall accept, or (b) if the property is sold by you, by the undersigned, or by or through any other person, during the period hereof, or (c) if the property is sold within six (6) months after the terminating date

hereof to a purchaser, on behalf thereof [*sic*], to whom it was submitted by you or your representatives, provided such party is identified on a list submitted to the undersigned within thirty (30) days after the expiration of this agreement."

Podolsky does not appear to be entitled to a commission under the plain language of the provisions, as it did not procure a purchaser willing to agree to the required terms and the property was neither sold during the term of the agreement nor within six months after the expiration of the agreement. Podolsky urges, however, that it is nevertheless entitled to a commission because (1) there was a "ready, willing, and able" buyer during the term of the agreement, and (2) the Discipios committed an anticipatory breach of the contract.

■ With regard to Podolsky's first contention, it relies on the well-established rule that when a broker *procures* a "ready, willing and able" buyer during the time of the agency, the seller of land is obligated to pay the broker's commission regardless of whether it decides to sell. *E.g., Bear Kaufman Realty, Inc. v. Spec Development, Inc.*, 268 Ill. App. 3d 898, 902, 645 N.E.2d 244, 247 (1994); *Kennedy, Ryan, Monigal & Associates, Inc. v. Watkins*, 242 Ill. App. 3d 289, 294, 609 N.E.2d 925, 928 (1993); *Zink v. Maple Investment & Development Corp.*, 247 Ill. App. 3d 1032, 1037, 617 N.E.2d 1269, 1273 (1993); Restatement (Second) of Agency § 445, Comment *d* (1958) ("[i]f the principal has given to the broker what purports to be his complete terms and the broker produces a customer ready, able, and willing to enter into the transaction on those terms, the principal cannot avoid paying the agreed commission by declining to enter into the transaction, or by insisting upon variations of or additions to such prescribed terms which the customer is unwilling to accept"). However, Podolsky does not seriously contend that it procured Town & Country, nor would we accept such an argument if made, since it is clear that Town & Country was aware that the property was for sale before Podolsky even entered into the listing agreement with the Discipios and Podolsky never had any contact with Town & Country. Podolsky asserts that the rule should apply in this case nonetheless since under subparagraph (b) of its agreement with the Discipios it would have been entitled to a commission in the event of a sale during the term of the agreement whether it procured the purchaser or not. In essence, Podolsky argues that subparagraph (b) makes this case indistinguishable from a case in which a seller refuses to sell to an acceptable buyer whom a broker procures. This contention is not without force. In either case, it would appear, the seller is unilaterally preventing the broker from receiving a commission by refusing to sell to an acceptable buyer.

However, there is no authority stating that a broker is entitled to a commission in the instant situation. The case that comes closest to doing so is *Hammel v. Ruby*, 139 Ill. App. 3d 241, 487 N.E.2d 409 (1985), which affirmed a judgment that a broker was entitled to a commission because of an oral sale during the period of an exclusive listing agreement, notwithstanding the lack of a written agreement. Accord *Bolger v. Danley Lumber Co.*, 77 Ill. App. 3d 207, 209-10, 395 N.E.2d 1066, 1068-69 (1979) (an oral agreement for the sale of property during the term of an exclusive listing agreement would entitle a broker to a commission).

However, the holdings in *Bolger* and *Hammel* turned on the seller's *agreement* to sell the property during the term of the agreement with the broker. *Hammel*, 139 Ill. App. 3d at 244, 487 N.E.2d at 412; *Bolger*, 77 Ill. App. 3d at 209, 395 N.E.2d at 1068. In the instant case, by comparison, the trial court specifically found that there was no "deal" between Town & Country and the Discipios until more than six months after the expiration of the agreement with Podolsky. Podolsky has not argued that the trial court erred in this determination, and we would not find it to be against the manifest weight of the evidence (see *Seymour v. Williams*, 249 Ill. App. 3d 264, 270, 618 N.E.2d 966, 971 (1993)) even if Podolsky had so argued. *Bolger* and *Hammel* are thus of limited significance.

Although our attention has not been called to any Illinois authority directly on point, decisions from other jurisdictions appear uniformly to support the Discipios' position. Even in the context of listing agreements under which the broker would be entitled to a commission in the event of any sale during the term of the agreement, the broker is not entitled to a commission when after the agreement has expired the landowner sells to a buyer whom the broker did not procure. *E.g., Estes v. Leibsohn*, 85 N.W.2d 15 (Iowa 1957); *Henry S. Grinde Corp. v. Klindworth*, 44 N.W.2d 417 (N.D. 1950); *Lewis v. Dahl*, 161 P.2d 362 (Utah 1945); *Mercantile Trust Co. v. Lamar*, 128 S.W. 20 (Mo. Ct. App. 1910); 12 Am. Jur. 2d *Brokers* § 274 (1997). The rationale for this type of case being treated differently from those in which the broker has procured the buyer is that unlike in the latter situation, the seller is not taking the benefit of the broker's actions.

"[T]he contract bound [the seller] to pay the commission if he sold the property during the period of the agency, but did not bind him to make a sale during said period unless a buyer was found by [the broker]. The utmost of his obligation to [the broker] was to allow it to find a purchaser while its agency continued, and thereby earn a commission, or to pay [the broker] a commission not earned by it in the event defendant found a buyer and sold during the period.

[The seller] would have been within his rights in refusing to sell until the expiration of the agency." *Mercantile Trust Co.*, 128 S.W. at 23 (holding that so long as the seller did not have an agreement with the buyer during the term of the listing agreement, it was free to delay selling until after the listing agreement had expired even where the delay was "for the purpose of escaping the payment of a commission").

*Lewis* and *Henry S. Grinde Corp.* precluded recovery despite the existence of oral agreements between the buyers and sellers during the brokerage agreement, because such agreements are unenforceable as between the parties thereto. *Lewis*, 161 P.2d at 365-66; *Henry S. Grinde Corp.*, 44 N.W.2d at 422-23. In Illinois, as in Utah and North Dakota, unwritten agreements for the sale of land are unenforceable. 740 ILCS 80/2 (West 1994). However, we agree with *Bolger, Hammel* and *Mercantile Trust Co.* that an oral agreement nevertheless constitutes a sale that would entitle a broker to a commission under an exclusive listing agreement. First, the listing agreement in this case did not require a written sale, and an oral agreement *is* a sale. An oral sale of property is voidable, not void, and may be enforced if the statute of frauds is not pled. *Koenig v. Dohm*, 209 Ill. 468, 476, 70 N.E. 1061, 1063 (1904); *Cain v. Cross*, 293 Ill. App. 3d 255, 258, 687 N.E.2d 1141, 1143 (1997). Second, from the standpoint of policy, we have some sympathy with the dissent in *Lewis* (161 P.2d at 368 (Wade, J., dissenting) ("courts should not place an interpretation on the meaning of words in contracts which will encourage connivance and fraud in order to avoid obligations")), and note that it would be more difficult for a buyer and seller to wrongfully collude to deprive a broker of his commission if the broker had the latitude to prove either an oral or a written sale agreement between them. As stated in *Mercantile Trust Co.*:

"The instrument by which plaintiff was appointed agent would be defeated in one of its main provisions if a complete agreement might have been reached [between the buyers and sellers] and yet liability to plaintiff be evaded by postponing the formal consummation of the sale until its agency expired. Such an interpretation would relieve defendant from the duty to observe good faith in keeping his agreement with plaintiff." *Mercantile Trust Co.*, 128 S.W. at 22-23.

We believe it is appropriate to circumscribe the opportunity for the buyer and seller to deliberately delay in order to avoid payment of the commission.

■ Moreover, while some cases, including *Mercantile Trust Co.*, have held that absent at least an oral agreement a seller may deliberately delay acceptance with impunity even if his sole purpose is

to avoid payment of a commission, we disagree with that result. See *RE/MAX R.E. Professionals, Inc. v. Armstrong*, 288 Ill. App. 3d 552, 558, 680 N.E.2d 520, 524 (1997) (Cook, J., specially concurring) (in context of exclusive listing agreements a broker is entitled to a commission if the seller acts in bad faith to delay a sale until after the agreement has expired); 12 Am. Jur. 2d *Brokers* § 274 (1997) (the rule that a broker is not entitled to a commission for a sale by an owner unless it is consummated within the term of the listing agreement applies only "[i]n the absence of collusion between the owner and the purchaser, or fraud practiced upon the broker"). This position is consistent with the general principle that in Illinois the parties to every contract owe each other duties of good faith and fair dealing. *J&B Steel Contractors, Inc. v. C. Iber & Sons, Inc.*, 162 Ill. 2d 265, 278, 642 N.E.2d 1215, 1222 (1994); *Saunders v. Michigan Avenue National Bank*, 278 Ill. App. 3d 307, 315, 662 N.E.2d 602, 609 (1996). Thus, Podolsky would have been entitled to a commission if it had shown that the Discipios had breached their duties of good faith or fair dealing by deliberately delaying the sale for purposes of avoiding payment of the commission. However, in this case the trial court did not find any evidence of fraud or breach of good faith and specifically found that it had not been proven that Francis said he was waiting to close on the sale in order to "beat [Podolsky] out of their commission." Podolsky has not appealed this finding, nor would we find it to have been against the manifest weight of the evidence (see *Braun-Skiba, Ltd. v. La Salle National Bank*, 279 Ill. App. 3d 912, 665 N.E.2d 485 (1996) (reviewing courts will defer to trial court's credibility determinations unless against the manifest weight of the evidence)) if Podolsky had asserted it was erroneous.

Podolsky also argues that it was entitled to its commission because the Discipios committed an anticipatory breach of the listing agreement by failing to notify it of the Town & Country inquiry and by Francis's purported statement at the June 1993 meeting that he intended to hold the Town & Country contract until after the listing agreement had expired. This contention cannot be sustained. First, Podolsky's argument is not truly for anticipatory breach. An anticipatory breach is a manifestation by one party to a contract of an intent not to perform its contractual duty when the time comes for it to do so even if the other party has by then rendered full and complete performance. *In re Marriage of Olsen*, 124 Ill. 2d 19, 24, 528 N.E.2d 684, 686 (1988); *Bituminous Casualty Corp. v. Commercial Union Insurance Co.*, 273 Ill. App. 3d 923, 930, 652 N.E.2d 1192, 1197 (1995). The actions of which Podolsky complains allege *present* breaches of contract—failure to perform, rather than manifestations of intent not

to perform in the future. Moreover, the actions of which Podolsky complains are not breaches. The Discipios did not breach the contract by failing to inform Podolsky of every inquiry which they received regarding the property. Their duty under the contract was not to inform Podolsky about inquiries but to "refer" inquiries to Podolsky—to tell the caller to deal with Podolsky. This Francis claimed he did. The circuit court's conclusion that he did is not against the manifest weight of the evidence, nor is its conclusion that Francis did not make the statement that he would not sell the property until after the expiration of the listing agreement. Finally, as explained above, the Discipios did not breach the listing agreement by failing to complete the sale until after the listing agreement and the six-month grace period had passed.

## II. THE CIRCUIT COURT DID NOT ERR IN EXCLUDING EVIDENCE THAT ATTORNEY FRANCIS DISCIPIO HAD PREVIOUSLY BEEN SUBJECT TO SANCTION FOR MISCONDUCT

■ Podolsky's second allegation of error on appeal is that the circuit court erred in granting the Discipios' motion *in limine* excluding any evidence of the fact that Francis Discipio had been suspended from the practice of law for splitting fees with an attorney he knew to have been disbarred. We disagree.

First, Podolsky argues that the suspension is analogous to a criminal conviction and may be admitted for impeachment purposes under the framework established by our supreme court in *People v. Montgomery*, 47 Ill. 2d 510, 268 N.E.2d 695 (1971). In the alternative, Podolsky urges us to allow the evidence as a specific act of misconduct, noting that several other states have allowed inquiry into disbarment for impeachment purposes (see *In re Thorman's Estate*, 144 N.W. 7, 9 (Iowa 1913); *Ecco Ltd. v. Balimoy Manufacturing Co.*, 179 Mich. App. 748, 751, 446 N.W.2d 546, 549 (1989); *Fuschetti v. Bierman*, 128 N.J. Super. 290, 298, 319 A.2d 781, 786 (1974); *State v. Pearson*, 39 N.J. Super. 50, 60, 120 A.2d 468, 473 (1956); *People v. Roth*, 139 A.D.2d 605, 527 N.Y.S.2d 97 (1988); *Hyman v. Dworsky*, 239 A.D. 413, 267 N.Y.S. 539 (1933)), and suggesting that such inquiry would be permissible under Rule 608(b) of the Federal Rules of Evidence, which he urges this court to adopt. Rule 608(b) provides:

> "Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of a crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired

into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified." Fed. R. Evid. 608(b).

We reject each of these arguments. Rulings regarding admission of evidence are within the trial court's discretion and will be upheld absent an abuse of that discretion. *Mann v. Mann*, 283 Ill. App. 3d 915, 918, 671 N.E.2d 73, 76 (1996). The only Illinois authority on point has refused to admit evidence of prior suspension or disbarment from the practice of law. See *George S. May International Co. v. International Profit Associates*, 256 Ill. App. 3d 779, 791, 628 N.E.2d 647, 655 (1993) (disbarment); *Pros v. Mid-America Computer Corp.*, 142 Ill. App. 3d 453, 472, 491 N.E.2d 851, 864 (1986) (suspension). We see no reason to depart from these cases.

Initially, we find that Francis's suspension is not sufficiently analogous to a criminal conviction with which he could be impeached to maintain admissibility on that basis. In *Montgomery*, our supreme court adopted the 1971 draft of Federal Rule of Evidence 609 and held that a witness may be impeached with proof of conviction of a prior crime, but only if the crime of which the witness was convicted (1) was punishable by death or imprisonment for more than one year, or (2) (regardless of the potential punishment) involved dishonesty or false statement. *Montgomery*, 47 Ill. 2d at 516-20, 268 N.E.2d at 698-700;[1] M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 609.2, at 415-16 (6th ed. 1994). Thus attorney disciplinary proceedings would not appear generally to be sufficiently similar to criminal proceedings [2] to support the analogy. However, we need not determine whether it would ever generally be appropriate to impeach an attorney with a prior sanction, because it is clear that in this case Francis's suspen-

---

[1]Other requirements are imposed as well, *e.g.*, the conviction may not be used if more than 10 years have elapsed since the individual was convicted or released from confinement (whichever is later), and the court may exclude the evidence if it determines within its discretion that the prejudicial effect of admitting the conviction would substantially outweigh its probative value. See *Montgomery*, 47 Ill. 2d at 516, 268 N.E.2d at 698, quoting proposed Rule 609(b) and proposed Rule 609(a)(3), respectively. However, we need not apply these additional safeguards in order to determine that the suspension in this case would not pass the *Montgomery* test.

[2]As one example, the standard of proof in attorney disciplinary proceedings is merely clear and convincing evidence (155 Ill. 2d R. 753(c)(6); *In re Bell*, 147 Ill. 2d 15, 36, 588 N.E.2d 1093, 1102 (1992)), as opposed to beyond a reasonable doubt.

sion from the practice of law fits into neither of the two *Montgomery* categories.

First, the only possible penalties that may be imposed in a disciplinary proceeding are disbarment, suspension (for a specified period and/or until further order of the court), censure, and reprimand. 134 Ill. 2d R. 771. Since none of these potential penalties is as severe as imprisonment for one year, attorney discipline cannot satisfy the first prong of the *Montgomery* test.

In determining whether a crime involves dishonesty or false statement under the second prong of the *Montgomery* test, only the provision that the defendant is found to have violated is to be considered; the circumstances of the defendant's commission of the violation are not relevant. *Knowles v. Panopoulos*, 66 Ill. 2d 585, 590-91, 363 N.E.2d 805, 808 (1977). Francis was disciplined for (1) aiding the unauthorized practice of law; (2) sharing legal fees with a nonlawyer; and (3) engaging in conduct that brought the legal profession into disrepute. *In re Discipio*, 163 Ill. 2d 515, 528, 645 N.E.2d 906, 912 (1994). None of these acts of misconduct are "crimes" of dishonesty or false statement, which would implicate Francis's propensity for falsehood on the witness stand.

Nor would we sanction the usage of an attorney's suspension or disbarment under the aegis of impeachment with a specific act of misconduct. In Illinois a witness's credibility may not be impeached by inquiry into specific acts of misconduct which have not led to a criminal conviction. *People v. West*, 158 Ill. 2d 155, 162-64, 632 N.E.2d 1004, 1007-08 (1994) (rejecting argument that specific acts of untruthfulness may be used to impeach in cases involving children who are too young to have developed a reputation as an exception to the rule that only reputation evidence may be used for impeachment); *People v. McGee*, 286 Ill. App. 3d 786, 796, 676 N.E.2d 1341, 1348 (1997) ("specific instances of untruthfulness are not admissible to attack a witness's believability"); M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 608.5, at 409 (6th ed. 1994) ("[t]he credibility of any witness, including a reputation witness, may not be attacked upon cross-examination by questioning the witness concerning specific instances of her misconduct not leading to a conviction"). But see *Esser v. McIntyre*, 169 Ill. 2d 292, 304-05, 661 N.E.2d 1138, 1144 (1995) (stating in *dictum* that with respect to occupation testimony, a witness's "general credibility may be attacked by cross-examining that witness regarding a disreputable occupation," although "the cross-examiner must accept the answer given by the witness during cross-examination"); *Kelley v. American Motors Corp.*, 130 Ill. App. 3d 662, 675, 474 N.E.2d 814, 823 (1985) (implying that witnesses might be impeached with individual

acts of misconduct but holding that the trial court had not abused its discretion in excluding such evidence); *People v. Kirwan*, 96 Ill. App. 3d 121, 126, 421 N.E.2d 317, 321 (1981) (following *Kelley*). Neither arrests, indictments, charges, nor even independent proof of the actual commission of a crime may be introduced for impeachment purposes. *People v. Pecoraro*, 175 Ill. 2d 294, 309, 677 N.E.2d 875, 883 (1997). This rule applies in civil cases as well as criminal. *Knowles*, 66 Ill. 2d at 590-91, 363 N.E.2d at 808.

Inquiry regarding attorney discipline is nothing more than an attempt to bring out prior specific acts of misconduct in derogation of the rule barring such inquiry. Notwithstanding that the majority of states and the federal courts might allow inquiry into prior acts, Illinois does not, and the authorities recognize that although this is the minority rule, it is the better practice. See 3A J. Wigmore, Evidence § 983, at 850 (Chadbourn rev. ed. 1970) ("the rule of total prohibition of cross-examination, as well as of extrinsic testimony, on [individual acts of misconduct], has thus received sanction, and is perhaps the one most consonant with the needs of the time"); 1 J. Strong, McCormick on Evidence § 41, at 138-39 (4th ed. 1992) ("a number of courts prohibit altogether cross-examination as to acts of misconduct for impeachment purposes. This latter view is arguably the fairest and most expedient practice because of the dangers otherwise of prejudice (particularly if the witness is a party), of distraction and confusion, of abuse by the asking of unfounded questions, and of the difficulties *** of ascertaining whether particular acts relate to character for truthfulness"). We reaffirm that Illinois bars impeachment with prior acts of misconduct, and we accordingly decline to adopt Federal Rule of Evidence 608(b).[3]

It is also important to note with respect to Rule 608(b) that even if we had the authority to adopt the rule and felt it were appropriate to do so, we would not adopt it in this case because to do so would not af-

---

[3]We note that although it is clear that the Illinois Supreme Court has the authority to adopt a federal rule (*e.g., Wilson v. Clark*, 84 Ill. 2d 186, 196, 417 N.E.2d 1322, 1327 (1981) (adopting Federal Rules of Evidence 703 and 705); *Montgomery*, 47 Ill. 2d 510, 268 N.E.2d 695 (adopting proposed Federal Rule 609)), it is not entirely clear that we as an appellate court have that same authority even were we otherwise inclined to do so. *Cf. Zelinski v. Security Lumber Co.*, 133 Ill. App. 3d 927, 938, 479 N.E.2d 1091, 1099 (1985); *People v. Krison*, 63 Ill. App. 3d 531, 537, 380 N.E.2d 449, 454 (1978) (an appellate court lacks the authority to adopt new rules or amend the present rules of our supreme court). However, we need not finally resolve this question because, for the reasons stated in the text, we would not adopt the rule in this case regardless of whether we have the power to do so.

fect the outcome of this case. The rule leaves admission of such evidence to the discretion of the court and we would not find the trial court to have abused its discretion in excluding the minimally relevant fact that Francis had shared fees with a non-lawyer in the past. As noted in our analysis of whether the suspension would be admissible under the *Montgomery* test, the connection between fee splitting and a witness's credibility is tenuous at best.

As a final note, we recognize that the trial judge based his decision on the fact that Francis had been allowed to regain his license to practice law. However, we may affirm the trial court for any reason appearing of record. *Country Mutual Insurance Co. v. Birner*, 293 Ill. App. 3d 452, 459, 688 N.E.2d 859, 864 (1997).

## CONCLUSION

For the reasons above stated, we affirm the judgment of the Circuit Court of Cook County.

Affirmed.

CAHILL and BURKE, JJ., concur.