2025 IL App (1st) 240781-U

No. 1-24-0781

Order filed August 28, 2025.

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| VICTOR GUADARRAMA and NANCY MORENO, as Special Administrators of the Estate of VICTORIA GUADARRAMA, Deceased, | ) ) ) ) | Appeal from the Circuit Court Of Cook County. |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | No. 2019 L 011770 |
| ELMHURST MEMORIAL HOSPITAL, a corporation, | ) ) ) | The Honorable Bridget J. Hughes, |
| Defendant-Appellee. | ) | Judge Presiding. |

_____

JUSTICE LAVIN delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Pucinski concurred in the judgment.

**ORDER**

¶ 1     *Held*:  The trial court abused its discretion when it allowed evidence of a settlement agreement between plaintiffs' emergency medicine expert and the Office of the Inspector General of the United States Department of Health and Human Services to be presented to the jury and when it allowed defendant to attribute plaintiffs' withdrawn expert's unfavorable testimony to plaintiffs. As these rulings deprived plaintiffs of a fair trial, we reverse the judgment entered on the jury verdict and remand this cause for a new trial.

¶ 2    Tragically, Victoria Guadarrama, then seven years old, suffered cardiac arrest while waiting to be treated at Elmhurst Memorial Hospital (defendant), located in the western suburbs of Chicago. Victoria died in the hospital after attempts to resuscitate her were unsuccessful. Victoria's parents, Victor Guadarrama and Nancy Moreno (plaintiffs), as special administrators of her estate, subsequently filed suit against defendant, asserting claims of negligence and vicarious liability for the alleged negligence of the hospital's employees in connection with Victoria's death.

¶ 3    The case eventually proceeded to trial where the jury returned a general verdict in favor of defendant. The jury also answered a special interrogatory wherein it found that the alleged negligence of the triage nurse who treated Victoria at the hospital was not the proximate cause of her death. Plaintiffs subsequently moved, unsuccessfully, for a new trial, setting forth a number of errors they believed occurred during the trial that warranted relief.

¶ 4    As will be discussed below, plaintiffs on appeal challenge the trial court's rulings on the parties' various motions *in limine* before trial, as well as the court's evidentiary rulings concerning plaintiffs' emergency medicine expert. Plaintiffs contend that the court's cumulative errors surrounding those rulings deprived them of a fair trial. We agree. For the following reasons, we reverse the judgment entered on the jury verdict and remand for a new trial consistent with this decision.

¶ 5                            I. BACKGROUND

¶ 6    On October 30, 2018, Victor Guadarrama picked up his daughter, Victoria, then seven-years-old, and her brother, at school. Victor then dropped the kids off at their mother, Nancy Moreno's store. Victoria informed her mother that she had a headache and had felt ill at school. Consequently, Nancy took Victoria home, gave her Tylenol, and fed her some soup. At her

mother's suggestion, Victora took a nap. After she woke up, Victoria watched television with her brother, had some milk and cookies and went to bed, complaining of a headache. The next morning, Victoria woke up without a headache but had swollen eyes and a sore throat, leading Nancy to take her to a pediatrician.

¶ 7    Around noon that day, Nancy took Victoria to Melrose Park Pediatrics where she was seen by James Pecard, PA-C, a physician's assistant. Pecard noted Victoria's temperature was normal and prescribed an antihistamine. Nancy and Victoria went home where Victoria napped and later received her first dose of the antihistamine. Nancy and Victoria went to bed for the night around 10:30 p.m. In the middle of the night, around 4:30 a.m., Victoria began vomiting. She vomited approximately eight times and was unable to hold tea down. Her mother called Melrose Park Pediatrics, reporting that Victoria's condition had worsened. Nancy, Victor, and Victoria returned to the clinic around 11:00 a.m. where Pecard diagnosed Victoria as dehydrated. He was unable to treat Victoria further at the clinic, so he advised Nancy to take her to the emergency room. According to Nancy, Pecard gave her a note to take with them to the emergency room, stating the reason Victoria was being sent there "was dehydration." Pecard, however, testified that while the note "implied dehydration," it stated, "Please evaluate for headache and nbnb emesis x8 since 3:00 a.m. this morning."

¶ 8    The family arrived at the Elmhurst Memorial Hospital emergency room around 2:00 p.m. Nancy testified that she showed the front desk Pecard's note, was subsequently given the note back, and directed to sit in the waiting area. About ten minutes later, they were called for the triage process, where a nurse visually evaluates the patient, asks open-ended questions about the patient's complaints and heath history, and takes vital signs. Joseph Schneider, R.N., conducted the triage process. He noted Victoria's recent health complaints, that her vital signs were normal,

that she did not appear to be in any distress, and that she did not have sunken eyes or skin discoloring. Nurse Schneider testified that he was not aware that Victoria had come to the emergency room directly from a physician's office or that Nancy had a note from Pecard. Nurse Schneider further testified that, even if he had known, his triage process would not have been any different. Nurse Schneider gave Victoria a dose of Zofran for nausea to allow her to keep liquids down. Victoria and her mother then returned to the waiting area.

¶ 9    About forty minutes later, Victoria and her mother were placed in a hospital room. Victoria declined a wheelchair, choosing to walk instead. Nancy subsequently requested something to drink for Victoria, but the responding nurse (Brielle Cunningham) informed them that Victoria had to be seen by the physician before she could have any liquids. Elmhurst nurses testified this was the normal hospital policy regarding liquids. According to Nurse Cunningham, Victoria was moving around with her mother and did not appear unwell.

¶ 10    About three minutes later, at 3:17 p.m., Nurse Cunningham heard Nancy scream for help. When she returned, Victoria was unresponsive. The emergency room physician and another nurse responded. A pediatric crash cart was obtained for Victoria, and a cardiac monitor showed a slow heart rate with slow respirations. The team initiated a "Code Blue" and proceeded in accordance with Pediatric Advanced Life Support protocols. Victoria received fluid boluses, epinephrine, bicarbonates and calcium chloride, among other medications. The effort to resuscitate Victoria was ultimately unsuccessful. She was pronounced dead at 4:18 p.m. that day. A postmortem examination of Victoria revealed that she died of "sepsis due to an upper respiratory infection."

¶ 11    Plaintiffs' suit against defendant sounding in institutional negligence and vicarious liability primarily focused on Nurse Schneider's alleged failure to properly triage Victoria,

including not learning that she had come from a pediatrician's office with a note, as well as his alleged failure to communicate that information to a physician more quickly, leading to a delay in Victoria's treatment and ultimate death. Plaintiffs and their two other children testified at trial, along with three Elmhurst nurses, the Elmhurst emergency room physician and the parties' expert witnesses.

¶ 12                                    A. Motions *in limine*

¶ 13     Before trial, defendant filed a motion *in limine* (No. 8), seeking to bar plaintiffs' emergency medicine expert, Dr. Eugene Saltzberg, from opining on the nursing standard of care and triage process. The trial court granted that motion.

¶ 14     Plaintiffs filed a motion *in limine* (No. 9), seeking to bar reference to a May 2023 Settlement Agreement that Dr. Saltzberg had entered into with the Office of the Inspector General of the United States Department of Health and Human Services (hereafter, Inspector General). The Agreement stemmed from alleged Medicare fraud committed by Dr. Saltzberg while he worked for two telemedicine companies between 2017 and 2019. Pursuant to the Agreement, Dr. Saltzberg did not admit to any liability but agreed to pay Medicare $230,000, to release him from any applicable civil penalties under federal law.[1] Additionally, he was not allowed to provide care under all federal health programs for 20 years. As a result of the Agreement, the Illinois Department of Financial and Professional Regulation temporarily suspended Dr. Saltzberg's medical license, which was on probation at the time of trial. Following extensive arguments from the parties, the court denied plaintiffs' motion.

¶ 15     More than six months before trial, plaintiffs withdrew their expert pathologist, Dr. Jason P. Tovar, as a controlled witness. Dr. Tovar had issued a written report stating that he was

---

[1]We note that the $230,000 paid by Dr. Saltzberg was the amount he made from working at the telemedicine companies.

"primarily in agreement" with the coroner's conclusions regarding Victoria's cause of death. His report noted that Victoria's "heart did not show any evidence of myocarditis acute or chronic." After reviewing slides taken from Victoria's heart, however, Dr. Tovar changed his opinion, finding evidence that she had myocarditis and died from a cardiac event, rather than an upper respiratory infection. Since plaintiffs had timely withdrawn Dr. Tovar as a controlled witness, they filed a motion *in limine* (No. 12), which sought to bar any reference to the doctor or his opinions. The court, however, denied plaintiffs' motion.

¶ 16     Last, relevant to this appeal, defendant filed a motion *in limine* (No. 17) to bar plaintiffs' controlled expert witness, Cynthina Smith, APCN-BC, MSN, RN, from offering proximate cause opinions about Victoria's death. The court granted that motion.

¶ 17                                    B. Trial

¶ 18     At trial, plaintiffs called Dr. Saltzberg to testify. He stated that Nurse Schnieder "should have known of [Victoria's] transfer from the pediatrician's office" which would have "resulted in an immediate evaluation in the treatment area of the emergency room by a physician." Dr. Saltzberg further testified that Nurse Schneider "should have immediately communicated" the pediatrician's referral to the emergency room physician. If he had, Victoria would have been treated sooner and her death avoided.

¶ 19     Likewise, Nurse Smith testified, in the main, that Nurse Schneider should have inquired during the triage process whether Victoria had been referred to the emergency room by her pediatrician and that this was her third visit to a provider in two days. According to Nurse Smith, if Nurse Schneider had obtained that relevant information, Victoria would have been placed into a higher acuity and treated sooner.

¶ 20    Defendant disclosed a number of expert witnesses under Illinois Supreme Court Rule 213(f)(3) (eff. Jan. 1, 2018). Dr. Daniel K. Benjamin, a board-certified pediatric infectious disease physician at Duke University Medical Center, testified that Victoria died of arrhythmia due to myocarditis. He explained that in a small number of patients, a virus can cause antibodies to mistakenly attack the heart. According to Dr. Benjamin, this is what occurred with Victoria. He further opined that her myocarditis existed when she presented to the emergency room and that dehydration played no role in her death.

¶ 21    Ashley Fates, defendant's nursing expert and a certified emergency room nurse at Loyola University Medical Center, testified that Nurse Schneider met the nursing standard of care with respect to Victoria's triage process. According to Nurse Fates, a nurse has no duty under the standard of care to discover whether the patient had seen another treater earlier in the day. Regardless, such information would not change the assessment. Nurse Fates further testified that nurses typically do not give patients water before they are seen by a physician.

¶ 22    Dr. Sanjeev Malik, defendant's emergency medicine expert and a board-certified emergency medicine physician and Vice Chair of Operations for the Department of Emergency Medicine at Northwestern Hospital, testified that referral notes from pediatricians are "helpful pieces of information" but "overall they don't affect much." Dr. Malik also testified that Victoria's triage process and wait time of roughly thirty minutes met the standard of care and that the standard of care did not require Nurse Schneider to inform the emergency room physician of the pediatrician's note. Finally, Dr. Malik testified that an acute cardiac event caused Victoria's death and that nothing about her condition would have alerted the emergency room to her myocarditis since she displayed no cardiac symptoms.

¶ 23    Next, Dr. Stuart Berger, defendant's expert witness in pediatric cardiology and a board-certified cardiologist at Lurie's Children's Hospital, testified that Victoria's presentation and death were consistent with an acute cardiac event due to underlying myocarditis, an inflammation of the heart muscle. Moreover, Dr. Berger testified that hospital staff could not have discovered her myocarditis before the cardiac event and that her death was not attributable to dehydration.

¶ 24    Last, Dr. J. Scott Denton, defendant's forensic pathologist, testified that he reviewed Victoria's autopsy and determined that her death was caused by myocarditis, not sepsis, and that dehydration played no role in her death. Dr. Denton displayed slides to the jury showing significant fatty infiltrations where Victoria's heart muscle had broken down over time. Dr. Denton concluded that Victoria's myocarditis was "not recent" and had been "ongoing." As will be addressed in our analysis, Dr. Denton's testimony repeatedly mentioned plaintiffs' withdrawn expert witness, Dr. Tovar, and that Dr. Tovar ultimately agreed that Victoria's death was caused by myocarditis based on the slides taken of her heart.

¶ 25                                  C. Verdict

¶ 26    Following closing arguments and jury instructions, the jury returned a general verdict in favor of defendant. The jury also answered a special interrogatory in the negative that asked whether Nurse Schneider's alleged negligence was the proximate cause of Victoria's death. Plaintiffs subsequently filed a posttrial motion, requesting a new trial based on errors related to the trial court's rulings on the above-mentioned motions *in limine*, as well as the court's evidentiary rulings.

¶ 27                                II. ANALYSIS

¶ 28                          A. Defendant's Motion to Strike

¶ 29    Initially, defendant in its brief has moved to strike plaintiffs' statement of facts because they fail to comply with Illinois Supreme Court Rule 341(h)(6) (eff. Oct. 1, 2020), which requires appellants to include in their brief a statement of facts containing "the facts necessary to an understanding of the case, stated accurately and fairly without argument and comment, and with appropriate reference to the pages of the record on appeal in the format as set forth in the Standards and Requirements for Electronic Filing the Record on Appeal."

¶ 30    Plaintiffs acknowledge their facts do not include proper citations to the pages of the record relied on and have indicated they have no problem with us solely relying on defendant's statement of facts.[2] Because defendant has provided a neutral facts section that is helpful to this court, we decline to strike plaintiffs' statement of facts and therefore deny defendant's motion. See *In re Jacorey*, 2012 IL App (1st) 113427, ¶ 17 (noting that Rule 341 is an admonishment to the parties, not a limitation upon this court's jurisdiction).

¶ 31                                    B. Motions *in limine* rulings

¶ 32    Turning to the merits of this appeal, as stated, plaintiffs challenge a number of the trial court's rulings on various motions *in limine*, arguing that the court's erroneous rulings on the motions deprived them of a fair trial in this case.

¶ 33    Motions *in limine* allow parties to obtain pretrial rulings that exclude inadmissible evidence and prohibit interrogation regarding such evidence to avoid making objections in the presence of the jury. *Griffin v. Prairie Dog Ltd. Partnership*, 2019 IL App (1st) 173070, ¶ 77. "Courts caution against granting such motions due to the potential danger of unduly restricting the opposing party's representation of its case." *Id*. We observe that the decision of whether a

---

[2]Plaintiffs, however, pointed out a few relevant facts in their reply brief that defendant omitted in its brief, which they have asked us to consider. See *e.g.*, *John Crane Inc. v. Admiral Insurance Co.*, 391 Ill. App. 3d 693, 698 (2009) ("[W]e will not strike a party's statement of facts unless it includes such flagrant improprieties that it hinders our review of the issues.").

motion *in limine* should be granted lies within the sound discretion of the trial court. *Id*. ¶ 66.

Consequently, we will not reverse the lower court's decision concerning a motion *in limine*

absent a clear showing of an abuse of discretion, which occurs when the court's ruling is

arbitrary, fanciful or unreasonable, or when no reasonable person would take the view adopted

by the court. *Id*. Likewise, a trial court has broad discretion in the admission of evidence and the

court's decision regarding such evidence is also subject to review under the abuse of discretion

standard. *Id*.

¶ 34                                    1. Motion *in limine* No. 9

¶ 35     First, we address plaintiffs' argument that the trial court erred in denying their motion *in*

*limine* No. 9, which sought to bar evidence of their emergency medicine expert, Dr. Saltzberg's

settlement agreement with the Inspector General.

¶ 36     The record in this case shows that plaintiffs requested, *inter alia*, that defense counsel and

their witnesses refrain from mentioning in the presence of the jury that Dr. Saltzberg "entered

into a Settlement Agreement with the Office of the Inspector General of the Department of

Health and Human Services regarding the practice of telemedicine consultations that Medicare

paid for." According to plaintiffs, because Dr. Saltzberg did not admit to any liability under the

terms of the settlement agreement, the agreement was not relevant to the issue in the instant

wrongful death action and would be unduly prejudicial against their expert. The trial court

disagreed, finding the agreement was relevant and probative of Dr. Saltzberg's credibility

because it led to the suspension of his medical license, which was still suspended at the time of

trial.[3]

_____

[3]We note that at a hearing on plaintiffs' motion *in limine* No. 9, the trial court erroneously stated,
"if Saltzberg is on the stand and says his license has never been suspended for Medicare fraud, then
[defendant has] to be able to prove that up if he denies it." As plaintiffs correctly pointed out, a cross-
examiner is bound by a witness's answer concerning his past conduct, even if the cross-examiner knows

¶ 37    Even if the agreement was relevant, its probative value was substantially outweighed by its potential to unfairly influence the jury in this case. Under the terms of the agreement, Dr. Saltzberg did not admit to any liability while the Inspector General likewise did not concede that its allegations of Medicare fraud against him were meritless. The jury, however, could have been unduly influenced by the fraud allegations notwithstanding that they never resulted in a conviction or any liability against Dr. Saltzberg.

¶ 38    Regardless, Illinois law provides that "a witness's credibility may not be impeached by inquiry into specific acts of misconduct which have not led to a criminal conviction." *Podolsky & Associates L.P. v. Discipio*, 297 Ill. App. 3d 1014, 1026 (1998). Here, it is undisputed that Dr. Saltzberg's alleged misconduct did not result in a criminal conviction. In fact, the settlement agreement between him and the Inspector General provided the exact opposite wherein it plainly states, "This Agreement is neither an admission of liability by [Dr. Saltzberg] nor a concession by the OIG that its claims are not well-founded." Yet the trial court treated the fact that Dr. Saltzberg paid a $230,000 fine (as part of the settlement agreement) as an admission of liability. When plaintiffs' counsel asked the court below how it could "conclude that [Dr. Saltzberg] did something improper when neither the OIG nor he admit[ted] to it," the court stated, "Well, he admitted to something. He paid over $200,000 in fines." This conclusion by the trial court is belied by the express language of the agreement, as shown above.

¶ 39    Moreover, even though the settlement agreement explicitly provided that Dr. Saltzberg did not admit to any liability, the court nevertheless found that he was liable. Specifically, the

---

the answer to be untrue or unsatisfactory. See *e.g.*, *Poole v. University of Chicago*, 186 Ill. App. 3d 554, 561 (1989) (noting that a cross-examiner may inquire into collateral matters disclosing the past conduct of a witness which tends to impeach his credibility, but the cross-examiner is bound by the witness's answer about said conduct, even if he believes or knows it to be untrue).

court stated that the suspension of his medical license was based on him "ordering medically unnecessary genetic tests for Medicare beneficiaries with whom the respondent had no physician/patient relationship and never examined and for which the Medicare program was paid." The trial court then stated, "it is *** Medicare fraud, and I think that's highly probative to his credibility." The court narrowed in on that finding when it ruled on plaintiffs' motion to reconsider, further stating: "this is Medicare fraud. That's what [Dr. Saltzberg] engaged in." Plaintiffs' counsel pointed out that Dr. Saltzberg was never found guilty of Medicare fraud, but the court disagreed, stating, "his license was suspended, and now he's on probation for committing a dishonest act during the time that he was retained by [plaintiffs' counsel] and prior to him testifying." According to the court, Dr. Saltzberg "admit[ted] *** to committing an action of Medicare fraud," even though he did no such thing as evidenced by the plain language of the settlement agreement.

¶ 40     What the trial court did here is "nothing more than an attempt to bring out prior specific acts of misconduct in derogation of the rule barring such inquiry." *Discipio*, 297 Ill. App. 3d at 1027. Illinois law is clear that a witness may not be impeached with prior acts of misconduct and that is exactly what was allowed to happen here. While defendant has correctly observed that a medical expert may be cross-examined with evidence of discipline affecting his license (see *e.g.*, *Cetera v. DiFilippo*, 404 Ill. App. 3d 20, 34 (2010)), that is a separate issue than the one before us. The issue here is whether Dr. Saltzberg's credibility could be impeached with specific evidence of alleged misconduct contained in the settlement agreement itself that did not result in a conviction.[4] As shown above, it could not.

---

[4]Plaintiffs have aptly observed in their reply brief that defendant "in the appellee's brief, tries to conflate the issues of using a Settlement Agreement for impeachment with the separate issue of his license." Plaintiffs astutely pointed out that their motion *in limine* No. 9 "never mentions license or licensure." Rather, it "sought to bar admission and use of the Settlement Agreement."

¶ 41 Accordingly, we conclude that the trial court abused its discretion when it denied plaintiffs' motion *in limine* No. 9, seeking to bar evidence of the settlement agreement between Dr. Saltzberg and the Inspector General. See *In re Marriage of Burns & Lifferth*, 2019 IL App (2d) 180715, ¶ 24 (noting that "a court abuses its discretion when its decision is based upon a misapplication of law").

¶ 42 Additionally, as will be discussed more below, the trial judge displayed repeated apparent bias and unfairness with respect to this witness in making various statements that contradicted the express language of his settlement agreement. Fortunately, those statements were made primarily outside the presence of the jury. The jury, however, did see the settlement agreement when defendant used it to impeach Dr. Saltzberg. The jury also heard defense counsel inquire into Dr. Saltzberg's alleged acts of misconduct contained in the agreement, even though he was never convicted of anything. It's safe to say that the improper admission and discussion of Dr. Saltzberg's settlement agreement likely influenced the jury's assessment of his credibility and testimony and may have affected the jury's verdict in this case. See *e.g.*, *Poole*, 186 Ill. App. 3d at 561 (concluding the plaintiff was entitled to a new trial where the defense counsel's improper impeachment based on inquiry into collateral matters concerning the witness "may have improperly influenced the jury's assessment of the credibility of the testimony of [the] plaintiff's expert witness"). This was unfairly prejudicial to plaintiffs, and, as we have stated, was in error. See *Powell v. Dean Foods Co.*, 2013 IL App (1st) 082513-B, ¶ 105 (stating that evidence of prior bad acts is not admissible to show a "crime of dishonesty" and a witness's credibility may not be impeached by inquiry into specific acts of misconduct that did not lead to a criminal conviction).

¶ 43                                   2. Motion *in limine* No. 12

¶ 44    Next, plaintiffs contend that the lower court abused its discretion when it denied their motion *in limine* No. 12 and allowed defendant at trial to refer to plaintiffs' former pathologist expert, Dr. Tovar, who was withdrawn as a witness more than six months before trial.

¶ 45    Defendant, however, asserts that plaintiffs have forfeited the issue because they failed to raise it in their posttrial motion in violation of Illinois Supreme Court Rule 366(b)(2)(iii) (eff. Feb. 1, 1994). That rule states that a "party may not urge as error on review of the ruling on the party's post-trial motion any point, ground, or relief not specified in the motion." Ill. S. Ct. R. 366(b)(2)(iii). Forfeiture aside, defendant asserts that Dr. Tovar's findings and report were properly relied on by the defense experts at trial.

¶ 46    Plaintiffs acknowledge the issue was not raised in their posttrial motion but point out that it was raised in their posttrial pleadings wherein they even sought leave of court to allow defendant time to respond to the abandonment issue. Plaintiffs ask that, under the circumstances, we consider the issue on the merits in order to reach a just result. See, *e.g.*, *Welch v. Johnson*, 147 Ill. 2d 40, 48 (1992) ("It is well established that the rule of waiver is a limitation on the parties and not on reviewing courts and that this court, in reviewing the judgments of lower courts, may, in furtherance of its responsibility to reach a just result, override considerations of waiver and consider a point which is either not raised or, if raised, not argued by the appellant.").

¶ 47    A review of the record shows that plaintiffs filed a motion *in limine* regarding the abandonment issue, made a contemporaneous objection at trial (as will be discussed below), and argued in a reply to their posttrial motion that the court erroneously denied their motion *in limine* seeking to bar any mention of their withdrawn expert, Dr. Tovar. Consequently, we find that defendant and the court below were sufficiently put on notice of the abandonment issue and that it has been preserved for appeal purposes, albeit tenuously. As our supreme court has elucidated,

our "forfeiture rules exist to encourage defendants to raise issues in the trial court, thereby ensuring both that the trial court has an opportunity to correct any errors prior to appeal and that the defendant does not obtain a reversal through his or her own inaction." *People v. Denson*, 2014 IL 116231, ¶ 13. While the forfeiture issue in *Denson* was slightly different than the one before us where it involved the defendant raising the issue in a response to the State's motion *in limine*, rather than filing his own motion *in limine*, we agree with the court there that the "above analysis elevates form over substance to an unwarranted and unnecessary degree." *Id*. Here, plaintiffs did raise the abandonment issue in the trial court, just in the wrong pleading. This nevertheless gave defendant and the trial court the opportunity to address the issue and/or correct any errors prior to appeal.

¶ 48    Even assuming there was no preservation of the abandonment issue, we address plaintiffs' argument on it in the interest of judicial economy and to assist the lower court as this issue is likely to appear again on remand. See, *e.g.*, *Central City Education Ass'n, IEA/NEA v. Illinois Educational Labor Relations Board*, 149 Ill. 2d 496, 524 (1992) ("Issues have been raised in these causes which are likely to reappear on remand, and in the interest of judicial economy the court will examine them now."); *Shackelford v. Allstate Fire & Casualty Insurance Co.*, 2017 IL App (1st) 162607, ¶ 10 (same).

¶ 49    Turning to the merits, and after reviewing the record before us, we find that the trial court's denial of plaintiffs' motion *in limine* No. 12 amounted to an abuse of discretion. In *Taylor v. Kohli*, 162 Ill. 2d 91, 95 (1994), our supreme court held that "an expert witness is not an agent of the party calling him, and therefore cannot make admissions against the calling party's interest." There, the trial court allowed unfavorable deposition testimony of the plaintiff's expert to be read into evidence, even though the plaintiff had abandoned that expert 19 months

before trial.[5] *Id.* at 94-95. The plaintiff appealed and the appellate court reversed, finding that testimony was erroneously admitted. *Id.* at 94. The supreme court agreed, stating, "it was error to read the unfavorable testimony of Dr. Koman as an admission against interest" because "as a matter of law *** an expert witness is not *per se* an agent of the party calling him." *Id.* at 96.

¶ 50    Furthermore, the *Taylor* court considered a party's right to abandon an expert witness and delineated the steps necessary to effect the abandonment. In doing so, the court stated that "the opposing party should be made fully aware, through clear notice, of such abandonment" and that the "notice should be given at a time where the opposing party is still capable of acting on that awareness to his benefit." *Id.* at 97. Here, it is undisputed that plaintiffs informed defendant that they were "withdrawing Dr. Jason Tovar as one of their Supreme Court Rule 213(f)(3) expert witnesses" on May 8, 2023, more than six months before the trial began in this case. Yet, the trial court subsequently denied plaintiffs' motion *in limine* No. 12, which sought to bar defendant's "attorneys, witnesses or expert witnesses from mentioning or referring in any way that Jason Tovar, M.D. had previously been disclosed as [an expert] witness." At the hearing on that motion, defense counsel argued that Dr. Tovar's opinion, which arguably aligned with the opinions of defendant's expert witnesses, was "extremely relevant to the issue in the case when the whole case comes down to what caused [Victoria's] death." The trial court then stated:

> "The jury would never know that Tovar was withdrawn, that the plaintiff[s] hired him, and he was withdrawn. The jury would never hear that but that he's another doctor that agrees."[6]

---

[5]We note that whether the plaintiff in *Taylor* actually notified the defendant of his intent to abandon the expert witness was disputed by the parties in that case. *Id.* at 98.
[6]The trial court further stated that it had to review the case law again before deciding whether defendant could mention that plaintiffs hired Dr. Tovar. The court, however, ultimately allowed that fact to be presented to the jury.

¶ 51    Still, at trial, defendant's expert witnesses were allowed to discuss Dr. Tovar's unfavorable testimony from his prior deposition that slides taken from Victoria's heart showed evidence of myocarditis, that she died from a cardiac event, and more importantly, that Dr. Tovar was hired by plaintiffs as one of their expert witnesses. For example, Dr. Benjamin, defendant's pediatric infectious disease expert, testified, "there were actually pathologists hired by both defense and plaintiff[s], and both pathologists, including the one hired by plaintiff[s], found evidence of myocarditis on Page 103, 107, and 109 of his deposition." When plaintiffs' counsel asked Dr. Benjamin whose deposition he was referring to, Dr. Benjamin answered, "Dr. Tovar, whom you hired."

¶ 52    Additionally, defense counsel asked Dr. Berger, defendant's pediatric cardiology expert, "You brought up Dr. Tovar. Who is Dr. Tovar?" Dr. Berger responded, "I think Dr. Tovar was also an expert pathologist. And in the deposition, he was asked also about those slides and whether they represented myocarditis." Defense counsel then asked whether Dr. Tovar "[w]as *** an expert hired by the plaintiff[s]" to which Dr. Berger responded, "Yes." Dr. Berger further testified that Dr. Tovar agreed that the slides of Victor's heart showed myocarditis.

¶ 53    Finally, Dr. Denton, defendant's forensic pathologist expert, was asked, "What was Dr. Tovar's testimony about the photos of the slides that the jury looked at today and that you have given opinions on today?" Plaintiffs' counsel objected that the question was leading and beyond the scope of his prior cross-examination of the witness wherein there was no mention of Dr. Tovar's unfavorable testimony regarding the slide photos or that he was plaintiffs' former expert.[7] The trial court overruled the objection, however. Dr. Denton then answered, "[Dr. Tovar] said that's myocarditis." What's more, even though Dr. Tovar had been withdrawn as an

---

[7]The only mention of Dr. Tovar during plaintiffs' cross-examination of Dr. Denton was that he received a copy of the slides of Victoria's heart.

expert witness well before trial, defense counsel asked Dr. Denton, "So you and Plaintiff[s'] *expert* agreed that based on the slides this appeared like myocarditis? (Emphasis added.)" Dr. Denton responded, "That's my opinion, yes. [Dr. Tovar] said those images showed myocarditis, and that's what I saw and I photographed. And [Dr. Tovar] didn't say it didn't show myocarditis."

¶ 54     We find, like the court did in *Taylor*, that the above testimony attributing Dr. Tovar's unfavorable deposition testimony to plaintiffs, and even referring to him as their current expert, was improperly admitted because he had been withdrawn as their expert witness more than six months before trial and was not their agent. Moreover, as shown above, defendant's expert witnesses repeatedly tied Dr. Tovar to plaintiffs in discussing his adverse testimony. This was highly prejudicial to plaintiffs, and any probative value it may have had was substantially outweighed by its prejudicial impact.

¶ 55     While defendant now argues the trial court correctly allowed its experts "to note Dr. Tovar's findings as a basis for their opinions," that is not the issue here. Rather, the problem lies in the defense experts testifying about Dr. Tovar's unfavorable testimony and then repeatedly attributing that testimony to plaintiffs, even though Dr. Tovar was no longer one of their experts. In other words, the mere mention of Dr. Tovar by the defense experts was not necessarily erroneous, but it was an abuse of discretion to allow them to impute his opinions to plaintiffs under the circumstances. Furthermore, to the extent defendant asserts that its experts were allowed to rely on Dr. Tovar's findings and conclusions in forming their opinions, plaintiffs have correctly observed that those defense experts were disclosed months before Dr. Tovar's deposition was taken. Thus, we don't see how the experts could have relied on Dr. Tovar's

unfavorable findings made during his deposition. Regardless, the issue is that the defense experts attributed those unfavorable findings to plaintiffs, not that they relied on them.

¶ 56    We conclude that the foregoing errors by the trial court demonstrate that plaintiffs were deprived of a fair trial in this case. Consequently, we need not address the remaining issues before us. However, we will address them in the interest of judicial economy and to assist the court below as the issues are likely to reappear on remand. See *Shackelford*, 2017 IL App (1st) 162607, ¶ 10.

¶ 57                                    3. Motion *in limine* No. 8

¶ 58    With that in mind, plaintiffs contend the trial court erred when it granted defendant's motion *in limine* No. 8, barring their emergency medicine expert, Dr. Saltzberg, from "offering any opinions regarding the standard of care applicable to nurses." Dr. Saltzberg would have testified that the nursing standard of care required Victoria's triage nurse (Nurse Schneider) to communicate to the emergency room physician on duty that Victoria came to the hospital from another healthcare provider and needed to be seen very quickly.

¶ 59    Defendant again insists that plaintiffs have forfeited this issue because they failed to develop any sufficient arguments with respect to it, and instead, simply supplied this court with "a lengthy recitation of settled Illinois law."

¶ 60    Because plaintiffs have presented a coherent legal argument supported by citations to legal authority, we find they have not forfeited review of the issue. Although plaintiffs in their brief frame this issue as one of first impression, we find that well-settled law dictates its resolution.

¶ 61    Our supreme court has delineated the requirements necessary for an expert physician in a medical malpractice case to testify about the standard of care in a given school of medicine.

*Sullivan v. Edward Hospital*, 209 Ill. 2d 100, 112 (2004). First, the expert witness must be licensed in the school of medicine about which he proposes to testify. *Id*. (citing *Purtill v. Hess*, 111 Ill. 2d 229, 242-43 (1986)). Second, the witness must demonstrate that he is familiar with the methods, procedures and treatments typically observed by other physicians, either in his community or a similar community. *Sullivan*, 209 Ill. 2d at 112-13 (citing *Purtill*, 111 Ill. 2d at 243). If these foundational requirements are not met, the trial court cannot allow the expert's testimony. *Sullivan*, 209 Ill. 2d at 113 (Citations omitted.). Contrarily, if the requirements have been satisfied, it is within the sound discretion of the trial court "to determine whether a physician is qualified and competent to state his opinion as an expert regarding the standard of care." *Id*. (citing *Purtill*, 111 Ill. 2d at 243).

¶ 62    Here, it is undisputed that Dr. Saltzberg was licensed as a physician in emergency medicine for over 40 years but was not licensed in nursing. Thus, the second prong, requiring Dr. Saltzberg to be familiar with the methods, procedures and treatments in emergency medicine, was met. While it appears the first prong, requiring him to be licensed in the school of medicine about which he proposes to testify (*i.e.*, emergency medicine), was also satisfied, the parties have not adequately argued that issue. In any event, assuming both prongs were satisfied, it was then within the trial court's discretion to determine whether Dr. Saltzberg was qualified to state his opinion as an expert concerning the nursing standard of care in this case. In ruling on plaintiffs' motion *in limine*, the trial court stated that Dr. Saltzberg could testify regarding the delay in communications between Nurse Schneider and the emergency room physician, but he could not testify as to "anything specific a triage nurse should or shouldn't have done." The court further stated, "it's also beyond a doctor's opinion to talk specifically what a triage nurse should do in terms of the interpreter, what you do with the note, what her vitals were, you know, those types

of things, because his whole opinion is that she should have immediately been brought back to a doctor and they could have saved her."

¶ 63    The record shows that plaintiffs' counsel was allowed to ask Dr. Saltzberg about proper communication between an emergency room physician and a triage nurse and whether that happened in this case. For example, Dr. Saltzberg was asked what Nurse Schneider should have communicated to the emergency room physician. Dr. Saltzberg testified,

"Well, the normal way that the triage nurse communicates with the emergency room physician would be to tell the emergency room physician that we have a patient who has been transferred from another level of care and is now here for us to evaluate and this is her complaints and this is the situation. Those are the normal communications between the triage nurse and the doctor."

Dr. Saltzberg was then asked if that had occurred here, what would he have done as an emergency physician, to which he replied,

"At that point I would say that if the child is in the clinic or doctor's office and that person felt that the patient needed to be brought to the emergency room for care, I would say that that patient needs to be brought immediately into the treatment area, because they are going from a lower level of care to a higher level of care and there really isn't always time to temporize that, and so that means that the doctor or provider at the clinic felt the patient needed to be seen in the emergency room and we need to get on it right away."

¶ 64    While plaintiffs claim the "trial court did not allow Dr. Saltzberg's opinion on what a triage nurse is required to communicate to an emergency physician," the record shows the opposite. Likewise, Dr. Saltzberg was even allowed to testify that if Victoria had received

intravenous fluids sooner, she would have survived. To the extent plaintiffs in their reply brief take issue with some of the trial court's rulings regarding counsel's questions to Dr. Saltzberg about causation, those rulings pertained to the form of the questions, not the substance. Regardless, as stated, these rulings were within the sound discretion of the trial court and plaintiffs have not shown that they amounted to an abuse of discretion. Accordingly, we cannot say the court erred in granting defendant's motion *in limine* No. 8.

¶ 65                                4. Motion *in limine* No. 17

¶ 66    We now turn to plaintiffs' challenge to the trial court's grant of defendant's motion *in limine* No. 17, which barred their nursing expert, Cynthia Smith, from offering opinions on the cause of Victoria's death.

¶ 67    Defendant, in response, has correctly observed that plaintiffs' claim essentially consists of conclusory allegations without any well-reasoned or developed arguments. Consequently, defendant asks that we deem the issue forfeited, noting that reviewing courts are "entitled to have the issues on appeal clearly defined with pertinent authority cited and a cohesive legal argument presented." (Internal quotation marks omitted.) *Eberhardt v. Village of Tinley Park*, 2024 IL App (1st) 230139, ¶ 60. Likewise, "[i]ssues that are ill-defined and insufficiently presented do not satisfy the rule and are considered forfeited." *Id*. Forfeiture aside, defendant asserts that plaintiffs' so-called argument on the issue deviates from well-settled Illinois law, and therefore, must be rejected.

¶ 68    Here, Nurse Smith was to testify that Nurse Schneider's experience level and failure to obtain Victoria's correct health history, in the correct language, proximately caused Victoria's death. The trial court barred that testimony when it granted defendant's motion *in limine* No. 17. Plaintiffs in their brief have set forth the relevant statutory language detailing the scope of

practice of an advanced practice nurse, like Nurse Smith. They then assert that the statutory language supports "that the legislature intended that advanced practice nurses can perform most of the functions of a physician, except operative surgery, including testifying as to the proximate cause of an injury or death." Plaintiffs, however, have not developed any legal argument to support that assertion or included any relevant case law. Instead, they claim "[t]here is no Illinois case law addressing whether an advanced practice nurse can testify as to what caused or contributed to an injury or death." That is not necessarily true.

¶ 69     In *Seef v. Ingalls Memorial Hospital*, 311 Ill. App. 3d 7, 11 (1999), the plaintiffs filed a medical malpractice action against the defendants after their son died *in utero* stemming from allegedly negligent prenatal care and an untimely C-section. The defendant-hospital filed a motion *in limine*, seeking to bar the plaintiffs' nursing exert, Sharon Hall, from offering proximate causation testimony concerning whether "the hospital's nurses deviated from the standard of care by failing to notify [the defendant-doctor] earlier of changes on the fetal monitor strips." *Id*. at 11-12. The trial court granted the motion and barred such testimony.[8] *Id*. at 12. On appeal, the reviewing court agreed with the lower court's ruling, stating, "Nurse Hall could not testify regarding proximate cause since she was not a medical expert." *Id*.

¶ 70     While it's unclear whether Nurse Hall was an "advanced practice nurse," like Nurse Smith was here, we find this to be a distinction without a difference. In other words, a nurse is still not a medical doctor whether or not she has an advanced nursing degree. In any event, plaintiffs have not provided a sufficient argument as to this issue and it is not our job to complete legal research to find support for it. See *Eberhardt*, 2024 IL App (1st) 230139, ¶ 60 ("The

---

[8]We note that Nurse Hall was actually barred from testifying at all because the trial court found her testimony "too speculative and too far removed." *Id*. at 12.

appellate court is not a depository in which the appellant[s] may dump the burden of argument and research."). Accordingly, we cannot say the trial court abused its discretion in granting defendant's motion *in limine* No. 17 and thereby barring Nurse Smith from offering causation testimony as to Victoria's death.

¶ 71    To aid the court on remand, however, we note that nurses are not precluded from offering testimony concerning basic nursing protocols, proper communication between nurses and other health care providers, as well as the standard of care applicable to nurses so long as they have the requisite experience and knowledge to provide such testimony. See, *e.g.*, *Gulino v. Zurawski*, 2015 IL App (1st) 131587, ¶ 65 (holding that Nurse MacVean could offer standard of care testimony since she worked in the nursing profession for more than 35 years and had the requisite nursing experience).

¶ 72                          C. Cumulative errors by the trial court

¶ 73    Last, plaintiffs assert that the trial court made prejudicial rulings that warrant a new trial. More specifically, plaintiffs contend the court deprived them of their right to put on evidence and determine the order in which their witnesses would testify. According to plaintiffs, they received much different and unfavorable treatment by the court compared to defendant. For the reasons already delineated above, we agree. We have highlighted some of the trial judge's apparent bias in this case (see *supra* ¶¶ 38-42).

¶ 74    Plaintiffs also assert that the trial court made a number of cumulative errors. As we have already determined that plaintiffs were deprived of a fair trial, we need not address this argument. Given our remand, we nonetheless revisit the lower court's demonstrable prejudice against plaintiffs' primary expert witness, Dr. Saltzberg. When plaintiffs' counsel asked him a question and clearly misspoke by referring to "Nurse Pecard," rather than "Nurse Schneider," Dr.

Saltzberg simply tried to correct counsel by stating, "I think you are referring to" [Nurse Schneider].[9] The court, however, cut him off, stating, "sustained," even though it does not appear any objection was made. The following colloquy then took place:

> "[Dr. Saltzberg]: Oh. Well, he said the wrong name. That's all he said.
>
> [The Court]: You have to keep talking.
>
> [Dr. Saltzberg]: Okay.
>
> [The Court]: You have no regard for my authority in this courtroom."

This was not the first time the court appeared hostile toward this witness. As set forth above, the court also made repeated statements about Dr. Saltzberg that contradicted the express terms of his settlement agreement.

¶ 75    Given the trial judge's apparent bias in this case, and notwithstanding that plaintiffs fail to raise this matter, we reassign this cause to a new trial judge on remand in accordance with Illinois Supreme Court Rule 366(a)(5) (eff. February 1, 1994). See *Cushing v. Greyhound Lines, Inc.*, 2013 IL App (1st) 103197, ¶ 370; *Raintree Homes, Inc. v. Village of Long Grove*, 209 Ill. 2d 248, 262-63 (2004); *Eychaner v. Gross*, 202 Ill. 2d 228, 279 (2002); Ill. S. Ct. R. 366(a)(5) (stating that a reviewing court may, in its discretion, "enter any judgment and make any order that ought to have been given or made, and make any other and further orders and grant any relief, including a remandment, a partial reversal, the order of a partial new trial, the entry of a remittitur, or the enforcement of a judgment, that the case may require"). While this discretionary power is used sparingly, we believe it is warranted in this case. Accordingly, we remand this matter to the presiding judge of the appropriate division of the circuit court for reassignment.

---

[9]As a reminder, Pecard is not a nurse. He was the physician's assistant who referred Victoria to the hospital.

¶ 76                              III. CONCLUSION

¶ 77    For the reasons set forth above, we reverse the judgment entered on the jury verdict and remand this cause for a new trial consistent with this order.

¶ 78    Reversed and remanded.